NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

BRENDA M., PETER O., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, Z.M., *Appellees*.

No. 1 CA-JV 15-0152
FILED 11-3-2015

---

Appeal from the Superior Court in Maricopa County
No. JD27368
The Honorable Connie Contes, Judge

**AFFIRMED**

---

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant Brenda M.*

Robert D. Rosanelli, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant Peter O.*

Arizona Attorney General's Office, Mesa
By Nicholas Chapman-Hushek
*Counsel for Appellees*

---

## MEMORANDUM DECISION

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge Jon W. Thompson and Judge Lawrence F. Winthrop joined.

---

H O W E, Judge:

¶1          Brenda M. ("Mother") and Peter O. ("Father") each appeal the juvenile court's order terminating their parental rights to their minor child, Z.M. The order terminated Mother's rights on the ground of chronic substance abuse pursuant to A.R.S. § 8–533(B)(3) and Father's rights on the ground of abandonment pursuant to A.R.S. § 8–533(B)(1). For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2          One day after Z.M.'s birth in September 2013, the hospital reported to the Department of Child Safety[1] ("Department") that Z.M. had tested positive for amphetamine—a metabolite of methamphetamine. The Department sent an investigator to the hospital, to whom Mother admitted that she used methamphetamine approximately twice per month for one year before Z.M.'s birth. She also admitted that although she attempted to quit after learning of her pregnancy, she used methamphetamine the week before delivery because she felt overwhelmed with having another child. The Department did not remove Z.M., but required Mother to submit to drug tests and live with a safety monitor. The Department also provided Mother with several services, including referrals to the TASC and TERROS centers for drug testing and treatment. Mother initiated services with both centers in October.

¶3          However, in the following weeks Mother missed many of the drug tests required by the centers and tested positive for methamphetamine on the ones she completed. Additionally, in November 2013 a case manager found Mother at home with Z.M. outside of the safety monitor's presence. Consequently, the Department petitioned for dependency, alleging that Mother neglected Z.M. due to substance abuse and continuously tested

---

[1]          The Department of Child Safety is substituted for the Arizona Department of Economic Security. *See* S.B. 1001, Section 157, 51st Leg., 2nd Spec. Sess. (Ariz. 2014) (enacted); Ariz. R. Civ. App. P. 27.

positive for methamphetamine. The Department then placed Z.M. with her maternal grandmother but allowed Mother supervised visitations with Z.M. and visit-only parent aide. The case manager informed Mother that to reunify with Z.M. she must participate in TASC urinalysis drug testing and TERROS mouth-swab drug testing. Additionally, the Department stated that Mother would have to demonstrate that she would live a drug-free life.

¶4     The next month, Mother and Father—who were not in a relationship—took Mother's three children, including Z.M., from their respective placements without the Department's authorization. The Department later found them in a Phoenix hotel room with weapons and drugs. As a result, the State incarcerated Mother and Father for custodial interference, and the Department placed Z.M. in a foster home. Between Z.M.'s birth and Mother's incarceration, Mother submitted to eight of the required 17 TASC urinalysis drug tests. Of those eight, all returned positive for methamphetamines. Due to her incarceration, the drug treatment centers terminated Mother's services.

¶5     Upon her release from jail nearly three months later, the juvenile court found Z.M. dependent as to Mother. The Department immediately re-referred Mother to both TASC and TERROS. Mother did not report for testing at TASC, but did attend her TERROS intake. The intake report noted that it "appears as though the severity of [Mother's] substance use is greater than what she disclosed." The report also recommended that Mother participate in intensive outpatient care including substance abuse classes and drug testing.

¶6     Mother sporadically attended her substance abuse classes and drug tests at TERROS. In the month following her intake, Mother tested positive for methamphetamine six times. After the sixth positive test, Mother stopped attending the TERROS classes so the center terminated her services. The Department re-referred Mother again in August, but Mother reported to the substance abuse classes only after TERROS sent her a ten day termination notice. Mother also began submitting urinalysis drug tests at TASC. In the five months from September 2014 to the date of the severance hearing, TASC and TERROS required Mother to submit to drug tests 42 times, but she did so only six times—each negative for methamphetamine.

¶7     While Mother struggled with her substance abuse issue, Father remained incarcerated. Three months after the Department petitioned for dependency as to Mother, the Department amended its petition to allege that Father failed to maintain a normal parental

relationship with Z.M. or to provide for her basic needs.[2] Father denied the allegations and requested a paternity test. The juvenile court ordered genetic testing of Father and Z.M. three months later, which both completed. The results confirmed Father's paternity, and the juvenile court found Z.M. dependent as to Father. During his incarceration, the Department told Father that he could send cards, letters, and gifts to Z.M. through the case manager. The case manager visited Father in jail once and sent multiple letters to him about communicating with Z.M. However, Father never asked about Z.M. nor sent her anything during his incarceration.

¶8        In November 2014, the Department moved to terminate Mother's parental rights on the ground of chronic substance abuse and Father's parental rights on the ground of abandonment, pursuant to A.R.S. § 8–533(B). Mother and Father objected, and the juvenile court conducted a contested severance hearing for Z.M. four months later. Father, who remained incarcerated, invoked his Fifth Amendment right to remain silent and refused to answer any questions, including those relating to the efforts he had made to establish and maintain a relationship with Z.M. When asked if he had sent anything to Z.M. or whether he felt that he failed to maintain a relationship with her, Father responded "I plead the Fifth . . . You're wasting your time . . . I don't got nothing to say to you." The juvenile court informed Father that it may draw a negative inference from his invocation; Father indicated that he understood by telling the judge "I know the law . . . I'm aware, ma'am." The Department's case manager opined that Father had failed to maintain a normal parental relationship with Z.M.

¶9        Mother testified that she was not a drug addict. The case manager, however, testified that Mother's inconsistent drug testing and participation in services led the Department to believe that she actively used methamphetamine and only submitted to tests when sober. The case manager also testified that while Mother acted attentively toward Z.M. during her supervised visitations and responded appropriately, termination was in Z.M.'s best interests because Z.M. deserved permanency. She further testified that termination was in Z.M.'s best interests because her foster placement provided safety and Mother could not demonstrate sobriety. Z.M.'s guardian ad litem also stated that termination was in Z.M.'s best interests. She stated that this was especially

---

[2]        The original dependency petition filed in November 2013 listed the incorrect person as Z.M.'s father. The juvenile court therefore granted the Department leave to amend the petition.

so due to Z.M.'s young age and that she was in a "safe, stable environment that's willing to provide her with permanency." A Department progress report to the juvenile court stated that Z.M.'s foster placement met her needs and was the least restrictive, and that Z.M. thrived in that environment.

**¶10**        The juvenile court terminated Mother's and Father's parental rights. It found Mother unable to discharge her parental responsibilities because of her chronic substance abuse and that reasonable grounds existed to believe it would continue. The juvenile court also found that Father had failed to maintain a normal parental relationship with Z.M. since his incarceration, and drew a negative inference from Father's refusal to testify otherwise at the hearing. Finally, the juvenile court found that termination was in Z.M.'s best interests. Mother and Father timely appealed.

## DISCUSSION

### 1. Grounds for Termination

**¶11**        Mother and Father argue that insufficient evidence supports the juvenile court's order terminating their parental rights to Z.M. We review termination orders for an abuse of discretion and affirm unless clearly erroneous. *Xavier R. v. Joseph R.*, 230 Ariz. 96, 100 ¶ 11, 280 P.3d 640, 644 (App. 2012). As the trier of fact, the juvenile court is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make findings. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 4, 53 P.3d 203, 205 (App. 2002). We accept the juvenile court's factual findings if reasonable evidence supports them. *Id.* We view the evidence and all reasonable inferences in the light most favorable to upholding the juvenile court's order. *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207 ¶ 2, 181 P.3d 1126, 1128 (App. 2008).

### a. Termination of Mother's Parental Rights

**¶12**        Mother argues that the juvenile court erred in terminating her parental rights because the Department failed to prove by clear and convincing evidence that she met the statutory elements of chronic substance abuse. To terminate parental rights, the juvenile court must find by clear and convincing evidence the existence of at least one statutory ground under A.R.S. § 8–533(B) and by a preponderance of the evidence that termination would serve the child's best interests. Ariz. R.P. Juv. Ct. 66(C). Additionally, the juvenile court must consider the "availability of reunification services to the parent and the participation of the parent in these services." A.R.S. § 8–533(D). To terminate a parent's rights under

chronic substance abuse, the juvenile court must find that: (1) the parent has a chronic history of substance abuse; (2) the parent is unable to discharge parental responsibilities because of her chronic substance abuse; and (3) reasonable grounds exist to believe that the abuse will continue for a prolonged and indeterminate period. A.R.S. § 8–533(B)(3); *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 377 ¶ 15, 231 P.3d 377, 381 (App. 2010).

**¶13** The juvenile court did not err in finding each statutory element satisfied here, or in finding that termination of Mother's parental rights was in Z.M.'s best interests. First, the record shows that Mother's abuse of methamphetamine had persisted for at least two years. Mother admitted that she began using the drug twice per month approximately one year before Z.M.'s birth, then continuously tested positive for methamphetamine for a year after delivery. In addition, the evidence supports the finding that Mother was unable to discharge her parental responsibilities. Mother used methamphetamine one week before Z.M.'s birth causing the child to test positive for amphetamine. Mother also put Z.M. at risk by taking her from her placement home to a hotel room with drugs and weapons. Finally, the evidence supports the finding that reasonable belief existed that Mother's abuse will continue for an indeterminate period. Although Mother knew that she needed to live a drug-free life to reunify with her child, she inconsistently participated in drug treatment services and failed to submit to the majority of her required drug tests. Of the tests she did submit, most were positive for methamphetamine. *See Raymond F.*, 224 Ariz. at 379 ¶ 29, 231 P.3d at 383 ("Father's failure to remedy his drug abuse, despite knowing the loss of his children was imminent, is evidence that he has not overcome his dependence on drugs . . . ."). Finally, the record shows that the Department made diligent efforts to provide Mother with reunification services including the parent aide services, supervised visitations, and multiple referrals to two drug treatment centers. Mother participated in some of these services, but failed to make the necessary sobriety changes that allowed for reunification.

**¶14** Mother counters that the six negative drug tests since September 2014 indicate that she is not a chronic substance abuser. During that same period, however, Mother missed 36 other required drug tests. Other than those few negative tests, no evidence suggests that Mother remained drug-free for a sustained period. Additionally, Mother argues that Mother's "occasional and sporadic" use of methamphetamine does not amount to chronic substance abuse. However, "drug abuse need not be constant to be considered chronic." *Id.* at 377 ¶ 16, 231 P.3d at 381. Thus,

sufficient evidence supports the juvenile court's finding that Mother's substance abuse justified termination of her parental rights.

### b. Termination of Father's Parental Rights

¶15        Father argues that the juvenile court erred in terminating his parental rights because its finding that he had abandoned Z.M. is clearly erroneous and contrary to evidence in the record. To terminate a parent's rights for abandonment, the juvenile court must find "the failure of a parent to provide reasonable support and to maintain regular contact with the child, including normal supervision." A.R.S. § 8–531(1). The statute further requires the juvenile court to ask "whether a parent has . . . made more than minimal efforts to support and communicate with the child." *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249 ¶ 18, 995 P.2d 682, 685 (2000). Abandonment is not measured by the parent's subjective intent, but by the parent's conduct. *Id.* The burden to act as a parent rests with the parent. *Id.* at 251 ¶ 25, 995 P.2d at 687. In determining whether a parent abandoned his child, the juvenile court may consider whether a parent has sent cards, gifts, or letters to the child. *Id.* at ¶ 24, 995 P.2d at 687.

¶16        The evidence supports the juvenile court's finding that Father abandoned Z.M. Father participated in the custodial interference of Z.M., indicating that Father knew of her during his incarceration. While incarcerated, Father made necessary efforts to respond to the Department's amended dependency petition and to request paternity testing. However, the Department case manager testified that Father took no such efforts to communicate with Z.M. or maintain regular contact with her. The case manager stated that she informed Father in person and in writing that he could communicate with Z.M. through her, but that Father sent no cards or letters, nor asked about Z.M.'s welfare. Additionally, the record shows that Father did not provide reasonable support to Z.M. while he was in jail; the case manager testified that Father did not send gifts or anything else to support to Z.M. Further, Father's incarceration prevented him from supervising Z.M. Finally, the record shows that the Department made diligent efforts to provide Father with these services by visiting him in the jail and sending him multiple letters informing him of his ability to communicate with Z.M. through the case manager.

¶17        Father counters that his lack of contact with Z.M. is "excusable" because the Department deprived him of any relationship with the child, but cites no statutory authority or case law supporting that contention. In essence, Father argues that he could not maintain a normal parental relationship with Z.M. because Department policy prohibits

7

inmates from visiting with children unless paternity is established, and because his paternity testing took several months to complete. However, when a father cannot "exercise traditional methods of bonding with his child, he must act persistently to establish the relationship however possible and vigorously assert his legal rights to the extent necessary." *Matter of Appeal in Pima Cty. Juvenile Severance Action No. S–114487*, 179 Ariz. 86, 97, 876 P.2d 1121, 1132 (1994). Father did not act persistently to establish a relationship with Z.M. however possible. Although he could not have visitations with Z.M. until paternity was established, Father had other means to establish a parental relationship. Father never accepted the Department's offer to deliver cards, letters, or gifts to Z.M. on his behalf. Additionally, the record shows that Father never requested visitation with Z.M. once his paternity was confirmed. Thus, sufficient evidence supports the juvenile court's finding that Father's actions constituted abandonment and justified termination of his parental rights.

### 2. Best Interests of the Child

¶18 The record also shows that the termination of Mother's and Father's parental rights was in Z.M.'s best interests. In determining a child's best interests, the juvenile court may consider whether the child's current placement meets the child's needs. *Bennigno v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 350 ¶ 23, 312 P.3d 861, 866 (App. 2013). The juvenile court may also take into account that the presence of a statutory ground, in most cases, will have a negative effect on the child. *Id.* Here, the Department progress report stated that Z.M.'s foster placement met her needs and that she thrived in that environment. Further, the case manager and guardian ad litem both testified that termination would be in Z.M.'s best interests because Z.M.'s foster placement provided her with safety, stability, and permanency. Finally, the juvenile court could take into consideration that Mother's substance abuse and Father's abandonment had a negative effect on Z.M. Accordingly, the juvenile court did not err in determining that termination of Mother's and Father's parental rights was in Z.M.'s best interests.

## CONCLUSION

¶19      For the foregoing reasons, we affirm.



Ruth A. Willingham · Clerk of the Court
FILED: ama