IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

|  |  |  |
|---|---|---|
| BENNIGNO R., | ) | 2 CA-JV 2013-0029 |
|  | ) | DEPARTMENT B |
| Appellant, | ) |  |
|  | ) | O P I N I O N |
| v. | ) |  |
|  | ) |  |
| ARIZONA DEPARTMENT OF ECONOMIC | ) |  |
| SECURITY, S.R., and L.R., | ) |  |
|  | ) |  |
| Appellees. | ) |  |
|  | ) |  |

APPEAL FROM THE SUPERIOR COURT OF PINAL COUNTY

Cause No. JD200500164R

Honorable Kevin D. White, Judge

AFFIRMED

Heard Law Firm
  By James L. Heard                                               Mesa
                                            Attorney for Appellant

Thomas C. Horne, Arizona Attorney General
  By Erika Z. Alfred                                        Tucson
                              Attorneys for Appellee Arizona
                              Department of Economic Security

K E L L Y, Presiding Judge.

¶1 Bennigno R., biological father of S.R., born in August 1999, and L.R., born in January 2009, appeals from the juvenile court's order terminating his parental rights to both children on the grounds of mental illness and length of time in court-ordered care, pursuant to A.R.S. § 8-533(B)(3) and (B)(8)(c), respectively. Bennigno maintains the court abused its discretion in denying his motion for summary judgment. He also contends the Arizona Department of Economic Security (ADES) had not proven that he had abandoned the children, that it had made a diligent effort to provide reunification services, or that termination of his rights was in the children's best interests. We affirm for the reasons stated below.

¶2 We review the evidence in the light most favorable to sustaining the juvenile court's ruling. *Lashonda M. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 77, ¶ 13, 107 P.3d 923, 928 (App. 2005). Thus, "we will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings" and the findings are clearly erroneous. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, ¶ 4, 53 P.3d 203, 205 (App. 2002).

¶3 The record and the evidence presented at the severance hearing established that this family, which had included four children who are not the subject of this appeal— A.R., P.R., M.R., and B.R.—and their mother Juana M.,[1] had a lengthy involvement with ADES and Child Protective Services (CPS), a division of ADES. Between October 1998 and May 2009, CPS received numerous reports that the children were being neglected

---

[1]Juana's parental rights to S.R. and L.R. also were terminated and this court affirmed the juvenile court's order. *Juana M. v. Ariz. Dep't of Econ. Sec.*, No. 2 CA-JV 2013-0028 (memorandum decision filed August 13, 2013).

and abused and that the parents were abusing drugs and alcohol. In 2004, for example, then two-year-old A.R. was found at a park by himself. Also in 2004, twelve-year-old P.R. reported she had been molested by her uncle, who subsequently admitted molesting her. At around this time, Bennigno was on probation for a domestic-violence offense.

¶4        In September 2005, a Pinal County Sheriff's deputy found A.R., then three years old, walking on a highway at 3:00 in the morning in his underwear. The deputy located the child's home, where he found S.R., then six years old, awake and in the care of an unconscious and apparently intoxicated uncle. The CPS investigator stated in the report to the juvenile court for the preliminary protective hearing that the home had been "in a state of squalor" and the children were filthy. Two other children had been left with the maternal grandmother, whose home was equally filthy and squalid.

¶5        The children were taken into protective custody on September 16, 2005, and ADES filed a dependency petition. The children were adjudicated dependent as to Juana after she submitted the issue to the court, and as to Bennigno after he reached an agreement with ADES during mediation. ADES provided the family with various services and in August 2006 the court dismissed the dependency.

¶6        In October 2009, ADES again took the children into protective custody and filed a dependency petition after receiving reports of domestic violence incidents, neglect of the children, and sexual abuse of S.R. and P.R. by family members.[2] In February

---

[2]P.R. gave birth to a child after she was sexually abused by the paternal uncle.

2010, Juana and Bennigno submitted the issue of dependency to the juvenile court and the court adjudicated the children dependent.[3]

¶7        In May 2011, ADES filed a motion to terminate the parents' rights to M.R., S.R., A.R., and L.R. on the grounds of length of time in court-ordered care and, as to Bennigno, mental illness, and, as to Juana, mental deficiency.[4]  After a four-day severance hearing between October 2011 and February 2012, the juvenile court found ADES had established the two grounds for terminating each parent's respective rights and although ADES had made "reasonable efforts to provide [the parents] with rehabilitative services," the parents had not benefitted from those services and additional services would be futile.  But, the court found that ADES had not sustained its burden of establishing termination of the parents' rights as to S.R. and L.R. was in the children's best interests "[i]n light of the bond they share[d] with their parents."  The court set the matter for a permanency hearing as to S.R. and L.R.

¶8        Thereafter, ADES continued to provide the parents and children with services.  In August 2012, ADES filed a second motion to terminate the parents' rights as to S.R. and L.R. on the same grounds alleged in the first severance motion.  Before the hearing, Bennigno filed a motion for summary judgment in which he argued, "[r]es [j]udicata precludes [ADES] from re-litigating the Best Interest claim upon which this

_____

        [3]Because P.R. had reached the age of majority, the adjudication did not include her.

        [4]M.R. subsequently was withdrawn from the proceeding because she did not wish to be adopted.

4

court has already ruled." The juvenile court heard the motion on the first day of the severance hearing in December 2012 and denied it.

¶9 Evidence presented at the three-day hearing included the foster mother's testimony that she intended to relocate to North Carolina and wanted to adopt the children and take them with her. She testified she could not serve as a placement for the children if the court were to order a guardianship or other solution short of termination of the parents' rights because she needed the permanency of adopting the children and assuming full responsibility for them. After taking the matter under advisement, the juvenile court granted ADES's motion, again finding that ADES had proved the alleged statutory grounds of mental illness as to Bennigno, mental deficiency as to Juana, and as to both parents, length of time in court-ordered care. The court concluded termination of the parents' rights was in the children's best interests even though they were bonded with the parents and would be adopted by the foster mother and moved to another state, finding there was no "reasonable prospect" that the children could be returned to the parents' care. This appeal followed the court's entry of a final order.

¶10 Bennigno argues the juvenile court "should have granted [his] Motion for Summary Judgment," contending that the principle of res judicata precluded ADES from re-litigating. But, Bennigno's argument is cursory at best, generally claiming without citation to the record that the evidence presented by ADES was not new and citing only a single case broadly describing the principle of res judicata. Notably, he cites no authority suggesting the application of res judicata is appropriate in a severance action.

5

¶11    Based on the lack of proper and meaningful argument alone, we could summarily reject the arguments Bennigno makes in this portion of his brief. *See* Ariz. R. Civ. App. P. 13(a)(6) (opening briefs must present "[a]n argument which shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on"); Ariz. R. P. Juv. Ct. 106(A) (Rule 13, Ariz. R. Civ. App. P., applies to juvenile appeals); *City of Tucson v. Clear Channel Outdoor, Inc.*, 218 Ariz. 172, ¶ 88, 181 P.3d 219, 242 (App. 2008) (appellate court will not address issues or arguments waived by party's failure to develop them adequately); *Watahomigie v. Ariz. Bd. of Water Quality Appeals*, 181 Ariz. 20, 26, 887 P.2d 550, 556 (App. 1994) ("[W]e will not consider issues not properly briefed."). But even assuming Bennigno's argument was presented and argued sufficiently, he has not persuaded us the juvenile court erred.

¶12    "Generally, the denial of a summary judgment motion is not reviewable on appeal from a final judgment entered after a trial on the merits." *John C. Lincoln Hosp. & Health Corp. v. Maricopa Cnty.*, 208 Ariz. 532, ¶ 19, 96 P.3d 530, 537 (App. 2004). But if the denial was based on a point of law, we may review the ruling as part of our review of the final judgment on appeal. *Hourani v. Benson Hosp.*, 211 Ariz. 427, ¶ 4, 122 P.3d 6, 9 (App. 2005). Even assuming it is appropriate to review the juvenile court's denial of Bennigno's motion for summary judgment because it was based on the legal principle of res judicata, the court did not err.

¶13    In his motion for summary judgment, Bennigno argued ADES had not alleged any "new facts or circumstances" in its second motion to terminate his parental

6

rights that would distinguish that motion from the initial motion, which had been "fully litigated and resolved on the merits." He asserted the juvenile court's denial of the motion was a final judgment on the merits. Quoting *Corbett v. ManorCare of America, Inc.*, 213 Ariz. 618, ¶ 13, 146 P.3d 1027, 1033 (App. 2006), he argued the first ruling "'bars further claims by parties or their privies based on the same cause of action.'" Acknowledging the "fluidity" of a child's best interest, Bennigno maintained res judicata nevertheless bars ADES from re-litigating the issue to the extent the claim is "indistinguishable from the last claim that the Court previously ruled on."

¶14 In its response to the motion, ADES argued it would introduce at the second severance hearing evidence regarding the children's best interests that had not been presented at the first severance hearing and that material fact issues existed precluding summary judgment. The new evidence consisted of the recent evaluations of the children by psychologist Al Silberman and new information regarding their placement. ADES argued, too, that the passage of a year since the first severance hearing was itself a change in the circumstances, noting the parents continued to be provided with services but had not improved their ability to parent. ADES also argued generally that strict application of the principle of res judicata in a child-welfare case is inappropriate.

¶15 At the hearing on the motion for summary judgment, Bennigno argued ADES was required "to show that there [had been] a substantial change in circumstances to warrant a new trial" and did not "dispute that if they can prove that[,] that they are entitled to a new trial." The juvenile court denied the motion for "each of the reasons cited by [ADES] in its response." The court noted that "the findings [it had] made" after

7

the first severance hearing "establish[ed] those issues for that period in time, and we're here to address from that point forward."

¶16 At the outset, we agree with courts from other jurisdictions that the doctrine of res judicata must be given limited application to dependency adjudications and proceedings to terminate parental rights. As the court observed in *People ex rel. L.S.*, 721 N.W.2d 83 (S.D. 2006), for example, "when it comes to protecting children res judicata should be cautiously applied" because "'[c]onsiderations regarding a child's welfare are rarely, if ever, static. In fact, it is more likely that the child's environment is constantly evolving, thus justifying the court's continuing jurisdiction.'" *Id.* ¶¶ 24, 27, *quoting State ex rel. J.J.T.*, 877 P.2d 161, 163 (Utah Ct. App. 1994). "[T]o effectively determine the best interests of a child, a court must be free from the imposition of artificial constraints that serve merely to advance the cause of judicial economy." *State ex rel. J.J.T.*, 877 P.2d at 164.

¶17 Here, the juvenile court did not err in refusing to apply res judicata and preclude re-litigation of the best-interest issue. The evidence established circumstances were different. New evidence was presented and almost a year had passed. The children's need for permanency persisted and even intensified, and the record supported the court's finding that the parents' inability to have the children returned to them had not changed.

¶18 Bennigno characterizes his second argument on appeal as challenging whether ADES made a diligent effort to reunify him with his children and provide appropriate services. But that is not the argument he ultimately raises. Rather, in two

8

brief paragraphs, he simply asserts, without citation to the record or authority, that ADES did not provide him with sufficient direction, insisting he made "efforts to comply with the directives of ADES." He maintains he was compliant with the case plan, visited his children, and "[i]n no way . . . abandoned his children."

¶19        The juvenile court found that ADES

> ha[d] made diligent efforts to provide appropriate reunification services to both parents, including psychological evaluations, visitation, counseling, parenting classes, substance abuse treatment, and urinalysis testing. Mother and Father have failed to benefit from these services in terms of resolving the underlying concerns regarding their ability to adequately parent, and they have been unable to remedy the circumstances that cause the children to be in an out-of-home placement.

These findings were preceded by findings the court had made during the course of the dependency and when it denied ADES's first motion to terminate the parents' rights. Bennigno did not challenge those earlier findings and, except for requesting additional visitation in April 2010, he never asked that he be provided additional services or more direction before the second severance hearing. Consequently, we agree with ADES he has waived the right to challenge the propriety of the services at this juncture. *See Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, n.8, 256 P.3d 628, 632 n.8 (App. 2011). Moreover, as ADES points out, Bennigno further waived this claim during the severance hearing when he maintained during closing arguments that the sole issue for the court to decide was whether termination of his rights was in the children's best interests.

9

¶20 In any event, there was more than sufficient evidence in the record supporting the juvenile court's finding that ADES had diligently provided appropriate and reasonable reunification services and had thereby satisfied its statutory obligation. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 19, 219 P.3d 296, 303 (App. 2009) (ADES has statutory obligation to make reasonable efforts to reunify family). There was also evidence in the record that Bennigno had not benefitted from the services and additional services would have been futile.

¶21 We also reject Bennigno's assertion as part of this argument that ADES failed to show he had abandoned the children. ADES's motion to terminate his rights was based on mental illness and length of time in court-ordered care. It never included abandonment as a ground for terminating his rights or, for that matter, for finding the children dependent as to him. ADES was not, therefore, required to establish he had abandoned them.

¶22 Finally, we reject Bennigno's claim that there was insufficient evidence to support the juvenile court's finding that termination of his rights was in the children's best interests. Bennigno speculates that the children's behavior was deleteriously affected by the prospect of moving to another state with the foster mother and away from their parents and siblings with whom they were connected. He contends the only reasons ADES "wanted to terminate [his] rights [was] because the placement wanted to move and didn't want to be limited as a guardianship." He also notes there was evidence a bond existed between him and the children.

10

¶23 Unlike statutory grounds for terminating a parent's rights—which must be established by clear and convincing evidence—whether severance is in the child's best interests must be proven by a preponderance of the evidence. A.R.S. §§ 8-533(B); 8-537(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, ¶ 41, 110 P.3d 1013, 1022 (2005). To establish best interests, ADES was required to show S.R. and L.R. "would derive an affirmative benefit from termination or incur a detriment by continuing in the relationship." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, ¶ 6, 100 P.3d 943, 945 (App. 2004). Among the factors relevant to this determination is whether a current plan for the child's adoption exists. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, ¶ 19, 83 P.3d 43, 50 (App. 2004). The juvenile court also may consider whether the current placement is meeting the child's needs, *see In re Maricopa Cnty. Juv. Action No. JS-8490*, 179 Ariz. 102, 107, 876 P.2d 1137, 1142 (1994), and may take into account that "[i]n most cases, the presence of a statutory ground will have a negative effect on the children," *In re Maricopa Cnty. Juv. Action No. JS-6831*, 155 Ariz. 556, 559, 748 P.2d 785, 788 (App. 1988).

¶24 The juvenile court's conclusion that termination was in the children's best interests was preceded by thorough, specific factual findings for which there is ample support in the record. That evidence includes the testimony of CPS case managers, therapists, the foster mother, and numerous exhibits admitted at the hearing. The court found the foster mother's testimony credible and compelling. She testified thirteen-year-old S.R. had been placed with her in July 2008, and three-year-old L.R. in March 2011. She stated she loves them, has cared and provided for them, and wants to adopt them,

11

adding, "they have been with me for so long and they feel safe around me, and I love them dearly as my own. And I just want them to have a safe environment, loving environment, and to be able to be successful for the future." She described the children's special physical and cognitive disabilities and needs and how she addresses them, including the services they require, which she ensures they receive.

¶25 The foster mother also stated she was committed to allowing the children continued contact with their parents. But she acknowledged her plan was to move to North Carolina to be with her mother. She planned to take S.R. and L.R. with her if she could adopt them, insisting she would still allow them continued telephonic or other contact with their parents any time. She stated she would not want custody of the children under a guardianship, explaining she wanted to be entirely responsible for them; she did not want to be required to return to Arizona or to be concerned about the input of anyone else. She explained she wanted to establish a life for herself and the children in North Carolina, with her own mother.

¶26 The current case manager's testimony also supported the juvenile court's findings. He testified termination was in the children's best interests because they needed permanency, which a guardianship could not provide. Similarly, psychologist Al Silberman testified he had conducted a bonding assessment or "best interest" evaluation of S.R. and L.R. He concluded L.R. was more bonded to her foster mother than her biological parents. He testified it would be in L.R.'s best interest to remain with the foster mother. He explained L.R. was developmentally delayed as a result of neglect, which included having been left in a swing for extended periods of time, and would need

12

"a lot of physical therapy . . . [and] a lot of consistency in her life." He believed severance of the parents' rights and adoption of L.R. by her foster mother was in her best interest if she "is to have a chance to survive in this world with low functioning and some physical limitations."

¶27 Silberman testified further that he did not believe continued contact between L.R. and her biological parents was "necessary for her mental and emotional [well] being," explaining that L.R.'s family consisted of the family created by her foster mother and the foster mother's sister, who also was involved with the children. Silberman stated the prospect of the foster mother's relocation to another state with the children did not change his opinion about their best interests because the home with the foster mother "is so much more of a stable place than what she's going to get from this family who doesn't really deal effectively with their children, has many problems, many problem children."

¶28 Silberman's opinion was essentially the same with respect to S.R. as it was for L.R. He believed she, too, should remain in the care of her foster mother, noting her developmental delays and other difficulties, including emotional challenges because of having been molested. He added that her behavior had improved significantly because of the structured environment provided by the foster mother. And, he opined, if S.R. were to have no contact with her biological parents, it would not cause her "significant harm" or be a "major detriment."

¶29 Although Silberman believed it would be best if S.R. could have regular contact with her biological parents, he nevertheless concluded the best option was

13

adoption of the children by the foster mother, even if she did leave the state. He felt it would be detrimental to both children if they were to be removed from the foster mother's care. When asked whether he thought family reunification was a "viable option" for S.R. and L.R., he said, "No."

¶30 The juvenile court's order reflects it carefully considered the complex issues involved in determining the children's best interests. It made specific factual findings in this regard, noting the competing interests. The court acknowledged the bond that existed between the children and their parents, but weighed that against the bond between them and the foster mother. The court also noted the difficulty posed by the foster mother's plan to relocate. Ultimately, however, the court weighed the evidence and, exercising its discretion soundly, determined the children's best interests would be served by terminating the rights of their parents so they could be adopted by the foster mother.

¶31 The juvenile court, not this court, is "in the best position to weigh the evidence, judge the credibility of the parties, observe the parties, and make appropriate factual findings." *In re Pima Cnty. Juv. Action No. 93511*, 154 Ariz. 543, 546, 744 P.2d 455, 458 (App. 1987). Consequently, we will not reweigh the evidence or substitute our judgment for that of the juvenile court. *Jesus M.*, 203 Ariz. 278, ¶ 4, 53 P.3d at 205. Bennigno is essentially asking us to reweigh the evidence that was before the juvenile court and urges us to reach a different conclusion about the children's best interests. We have no basis for doing so. Rather, we find there was more than reasonable evidence to support the court's findings and therefore adopt its ruling. *See id*. ¶ 16.

14

¶32     For the reasons stated herein, we affirm the juvenile court's order terminating Bennigno's parental rights to S.R. and L.R.

/s/ Virginia C. Kelly
VIRGINIA C. KELLY, Presiding Judge

CONCURRING:

/s/ Peter J. Eckerstrom
PETER J. ECKERSTROM, Judge

/s/ Philip G. Espinosa
PHILIP G. ESPINOSA, Judge