NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

JANINE E., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.S., R.S., *Appellees*.

No. 1 CA-JV 17-0026
FILED 8-1-2017

---

Appeal from the Superior Court in Maricopa County
No. JD27032
The Honorable Jeanne M. Garcia, Judge

**AFFIRMED**

---

COUNSEL

Czop Law Firm, PLLC, Higley
By Steven Czop
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Amber E. Pershon
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Kenton D. Jones delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Retired Judge Patricia K. Norris[1] joined.

---

**J O N E S**, Judge:

**¶1**        Janine E. (Mother) appeals the juvenile court's order terminating her parental rights to A.S. and R.S. (the Children).  Mother argues the Department of Child Safety (DCS) failed to prove by clear and convincing evidence that severance was warranted on the ground of abuse, and failed to prove by a preponderance of the evidence that severance was in the Children's best interests.  For the following reasons, we affirm.

**FACTS[2] AND PROCEDURAL HISTORY**

**¶2**        In September 2013, the Children's father (Father) requested DCS care for the Children, then ages six and four, while he sought treatment for substance abuse.  After learning Mother did not have stable housing for the Children, DCS assumed custody of them, placed them with their paternal grandmother (Grandmother), and filed a petition alleging the Children were dependent as to Mother on the ground of neglect.[3]  Mother was referred for substance abuse testing and treatment, a psychological

---

[1]        The Honorable Patricia K. Norris, Retired Judge of the Court of Appeals, Division One, has been authorized to sit in this matter pursuant to Article 6, Sections 3 and 20, of the Arizona Constitution.

[2]        "We view the facts in the light most favorable to upholding the juvenile court's order terminating parental rights."  *Marianne N. v. DCS*, 240 Ariz. 470, 471 n.1, ¶ 1 (App. 2016) (citing *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010)).

[3]        DCS also alleged the Children were dependent as to Father on the grounds of neglect, substance abuse, and mental illness.  The Children were later adjudicated dependent as to Father but were ultimately returned to his care, and DCS did not pursue termination of his parental rights.

evaluation, counseling, therapeutic and supervised visitation, and transportation assistance.

**¶3** Shortly after removal, the Children began disclosing prior abuse by Mother and her boyfriend, Cyrus M. These disclosures, made to several adults throughout the case, included Mother and Cyrus handcuffing A.S. to her bed at night and, when she urinated in the bed, Cyrus repeatedly spanking her before throwing her in a cold shower while Mother pushed her face down on the floor of the bathtub. A.S. also reported Mother and Cyrus would "poke" her in the vagina and spank her with a paddle. R.S. reported "mommy and Cyrus put tape on her mouth one time to keep her from screaming." Although A.S. denied that occurrence, she then confirmed the tape they had put on R.S.'s mouth was gray duct tape. The Children also began exhibiting problematic behaviors, including aggressive outbursts and attempts at self-harm that ultimately required hospitalization. These behaviors worsened after contact with Mother, who was observed whispering to the Children during visitation. DCS records indicate three prior reports of neglect or physical abuse by Mother and/or Cyrus in 2012 that were closed as unsubstantiated. Mother claimed those reports were made by a "disgruntled roommate" and denied she or Cyrus abused the Children.

**¶4** Visitation was suspended at the recommendation of the Children's therapist because Mother violated visitation guidelines, and then all contact stopped while the abuse allegations were investigated. Mother was, however, permitted to send cards and letters through DCS. The investigation was closed, and no charges were filed, because Cyrus denied the allegations and refused a polygraph test. In March 2014, the juvenile court adjudicated the Children dependent as to Mother and adopted a case plan of family reunification.

**¶5** In April 2014, Mother participated in a psychological exam with Celice Korsten, Psy.D. Mother reported she had discontinued her romantic relationship with Cyrus in December 2013 but continued to reside with him for financial reasons. She denied Cyrus had sexually abused the Children and excused his failure to take the polygraph test because "[he] has degenerative disc disease and . . . has not been able to get to the police department" for the test. Dr. Korsten observed Mother to have "a pattern of denying and minimizing her problems" and to "exhibit[] limited insight and judgment into her difficulties." She also found Mother "attempted to present herself in an overly positive manner and failed to acknowledge common human frailties . . . suggest[ing] she answered items defensively and underreported psychological problems," making it difficult to assess

her psychological functioning. Dr. Korsten opined Mother's prognosis to become a minimally adequate parent was fair, but only "if she were to obtain stable housing and gainful employment" and end her relationship with Cyrus. She recommended Mother participate in individual therapy to help her develop more effective coping skills and address her poor judgment and lack of insight, as well as family therapy and parenting classes.

¶6            In May 2014, Cyrus moved to Washington. That same month, A.S. underwent a psychological evaluation with Glenn Moe, Ph.D., wherein she reasserted instances of physical abuse and expressed an extreme fear of Cyrus. Dr. Moe diagnosed A.S. with post-traumatic stress disorder (PTSD) stemming from prior physical abuse. He did not believe A.S. had been sexually abused. Dr. Moe recommended A.S. continue individual therapy to address her past trauma and engage in therapeutic visitation with Mother, but only if Mother did not rekindle her relationship with Cyrus.

¶7            In August 2014, the juvenile court adopted a concurrent case plan of severance and adoption. The following October, Mother began therapeutic visits with the Children to rebuild their trust in her. Around this time, Grandmother began insisting A.S. had been sexually abused by Cyrus, and visits were stopped. The DCS caseworker consulted Dr. Moe, who concluded Grandmother may be negatively influencing A.S.'s view of Mother and recommended DCS consider placing the Children elsewhere. He reiterated that, although he found no evidence of sexual abuse, A.S. had made credible reports of physical and emotional abuse inflicted in Mother's home and suffered from PTSD as a result. Following an evidentiary hearing in December, the juvenile court ordered DCS to find the Children a therapeutic foster home. Despite receiving therapy and medication management, the Children's behavioral issues continued.

¶8            In January 2015, R.S. participated in a psychological evaluation with Dr. Moe. R.S. disclosed past physical and emotional abuse by Cyrus, including him handcuffing her in a dark room and forcing her to stand in a corner with no clothes on. R.S. repeatedly described Cyrus as very angry and mean to her and that she had a "'plan' to behave well" when returned to Mother so that Mother and Cyrus "won't hurt us." R.S. expressed deep fear of Cyrus, including a fear that he would take her away and kill her, but nonetheless identified with him, stating that Cyrus "is mean but I still love and miss him," and "I don't care if he hurts me." Dr. Moe concluded R.S. was also a victim of physical and emotional abuse by Cyrus.

¶9            In February 2015, the Children were moved to a therapeutic foster home, and their behaviors improved. Mother began individual counseling, which she completed in July, and successfully completed therapeutic visits with the Children. Because Mother was engaged in services and reported she had discontinued all contact with Cyrus, the juvenile court returned the Children to Mother's physical custody, with the assistance of a family reunification team, in August. Nonetheless, as a precaution, the safety plan that was implemented prevented the Children from having any contact with Cyrus. But a few weeks later the Children's behaviors began to escalate, and R.S. reported to her teacher that "Cyrus went away to Washington to hide, but he is back . . . and she is not allowed to tell [her therapist] that Cyrus is back" living in Mother's home. A.S. confirmed Cyrus was in the home, and she was directed not to tell anyone. DCS was also concerned that Mother was not providing the Children adequate food, failed to tell their new school about their individualized education plans, and was not keeping up with the Children's medications and appointments. After concluding the Children were no longer safe in Mother's home, the court returned the Children to DCS's care.

¶10           Although Mother denied she or the Children had any contact with Cyrus since he moved to Washington, Cyrus spoke, in person, with a member of the family reunification team and attended a court hearing in October 2015. At any rate, Mother resumed her relationship with Cyrus and the two conceived a son shortly thereafter.

¶11           Meanwhile, the Children reported to their attorney, their guardian ad litem, and the DCS caseworker that they were happier in the foster home because they felt safer and, although they loved their Mother, they wanted nothing to do with Cyrus. Despite the Children's fear, Mother was observed telling them that Cyrus missed them and denied he had caused them any trauma. Over the parents' objections, the juvenile court changed the case plan to severance and adoption. DCS immediately moved to terminate Mother's parental rights. Mother continued supervised visitation until May 2016 when she moved to Washington with Cyrus.

¶12           Mother objected to the severance, and the juvenile court held a three-day contested hearing in September and October 2016. At the time of the hearing, Father was participating in services, and the Children had returned to his custody.

¶13           At the hearing, Mother testified she was financially dependent upon Cyrus, and the two were engaged with "a marriage license and everything." Mother refused to consider the possibility that Cyrus

mistreated the Children or that the Children suffered as a result of their interactions with him; instead, she blamed the allegations of abuse entirely on Grandmother "put[ting] words into the girls' mouths about Cyrus" and the fact that "a lot of kids don't know the difference [between abuse and discipline]." She denied the Children were afraid of Cyrus for any reason other than his having "a deep voice [because] if he raises his voice, . . . it can be scary and intimidating to a small child."

¶14        The DCS caseworker confirmed the Children remained extremely afraid of Cyrus, and, although they love Mother, they "want nothing to do with [her] if Cyrus is there." The caseworker testified the Children remained at risk for abuse and neglect because Mother is committed to remain with Cyrus and, even if he is not directly involved with the Children, they associate him with Mother and continue to experience extreme anxiety over "the thought of Cyrus . . . parenting their little brother, [and the] thought of Cyrus being with their mother." The caseworker opined that as long as Cyrus remains "a recurring event in their heads," the Children will be unable to process their trauma. Additionally, the caseworker expressed concern that Mother was not truthful throughout the case and would continue to minimize and conceal the Children's fears, Cyrus' involvement, and her own responsibility for the circumstances.

¶15        After taking the matter under advisement, the juvenile court found DCS proved by clear and convincing evidence that termination of Mother's parental rights was warranted because: (1) Mother failed to protect the Children from abuse by Cyrus, *see* Ariz. Rev. Stat. (A.R.S.) § 8-533(B)(2)[4]; and (2) Mother had been unable to remedy the circumstances causing the Children to be placed in out-of-home care for longer than fifteen months, and there was a substantial likelihood she would be unable to do so in the near future, *see* A.R.S. § 8-533(B)(8)(c). The court also found severance was in the Children's best interests and entered an order terminating Mother's parental rights. Mother timely appealed. We have jurisdiction pursuant to A.R.S. §§ 8-235(A), 12-120.21(A)(1), -2101(A)(1), and Arizona Rule of Procedure for the Juvenile Court 103(A).

---

4        Absent material changes from the relevant date, we cite a statute's current version.

**DISCUSSION**

**I.    DCS Proved the Statutory Grounds for Severance by Clear and Convincing Evidence.**

**¶16**        To terminate a parent's rights, the juvenile court must find clear and convincing evidence to support at least one statutory ground for severance.  *See* A.R.S. § 8-533(B); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000).  A parent's rights may be terminated when "the parent has neglected or willfully abused a child."  A.R.S. § 8-533(B)(2). "This abuse includes serious physical or emotional injury or situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child."  *Id.*; *see also E.R. v. DCS*, 237 Ariz. 56, 59, ¶¶ 12-15 (App. 2015) (concluding abuse warranting termination of parental rights may occur even absent serious physical or emotional injury or the diagnosis of a medical doctor or psychologist).  We review the juvenile court's termination order for an abuse of discretion and "will affirm the juvenile court's factual findings if supported by reasonable evidence." *Dominique M. v. DCS*, 240 Ariz. 96, 97, ¶ 6 (App. 2016); *see also E.R.*, 237 Ariz. at 58, ¶ 9 (quoting *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004)).

**¶17**        Mother argues the evidence is insufficient to support a finding of abuse because: (1) Mother denied any abuse occurred; (2) Grandmother may have influenced the Children; (3) the Children were not trustworthy reporters and their descriptions of events are "subject to a wide range of interpretation"; and (4) no criminal charges were ever filed. Mother essentially asks this Court to reweigh the evidence presented to the juvenile court — a task in which we will not engage.  *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 351, ¶ 31 (App. 2013) (citing *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002)).  And while it is true DCS presented no direct evidence of abuse, circumstantial evidence remains evidence.  *See State v. Harvill*, 106 Ariz. 386, 391 (1970) ("[T]he probative value of direct and circumstantial evidence [is] intrinsically similar; therefore, there is no logically sound reason for drawing a distinction as to the weight to be assigned each.").

**¶18**        As discussed above, and as found by the juvenile court, the Children reported multiple instances of abuse by Cyrus to various adults other than Grandmother throughout the three years they were in out-of-home care.  The juvenile court found the Children's reports credible after noting "A[.S.], at age 7, is too young to have any motive to lie."  Moreover, Dr. Moe, a neutral evaluator with substantial education and relevant

experience, believed the Children were victims of physical and emotional abuse by Cyrus. His diagnosis was bolstered by the Children's reactive behaviors and their extreme fear of Cyrus.

**¶19** Although Mother argues she was unaware Cyrus was mistreating the Children, she was on notice of the allegations as early as 2012, when DCS investigated multiple reports that Mother or Cyrus was physically abusing the Children and leaving them in dark rooms for days without food. Mother had an additional opportunity to stand up for the Children during the dependency proceedings when Dr. Moe diagnosed the Children with PTSD caused by past physical abuse. Instead, however, she simply denied any possibility the Children were fearful, traumatized, or mistreated by Cyrus and further cemented her relationship to Cyrus by conceiving another child.

**¶20** DCS presented clear and convincing evidence to the juvenile court that Mother knew or reasonably should have known Cyrus caused the Children serious physical and emotional injury and willfully failed to protect them from that harm. The juvenile court's findings are supported by the record, and we find no abuse of discretion.[5]

## II. DCS Proved by a Preponderance of the Evidence Severance was in the Children's Best Interests.

**¶21** To terminate parental rights, the juvenile court must also find by a preponderance of the evidence that severance is in the child's best interests. A.R.S. § 8-533(B); Ariz. R.P. Juv. Ct. 66(C); *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005). Termination is in a child's best interests if the child "would derive an affirmative benefit from termination or incur a detriment by continuing in the relationship." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 6 (App. 2004) (citations omitted). We, again, review for an abuse of discretion. *See supra* ¶ 16.

**¶22** The juvenile court found termination was in the Children's best interests because Mother will not protect them from harm. Indeed, the court noted Mother "has chosen Cyrus over the girls and has moved away,"

---

[5] Because we conclude clear and convincing evidence supports termination of Mother's parental rights on the ground of abuse, we need not and do not address whether severance was also warranted based upon the time the Children were in out-of-home care. *Michael J.*, 196 Ariz. at 251, ¶ 27.

and further efforts at reunification would be futile given Mother's "disbelief that Cyrus harmed the children."

**¶23** Mother argues severance is not in the Children's best interests because she shares a bond with the Children and a continued relationship with her would allow them to have a relationship with their half-brother.[6] However, "even in the face of such a bond, the juvenile court is required to evaluate the totality of the circumstances and determine whether severance is in the best interests of the children." *Dominique M.*, 240 Ariz. at 98-99, ¶ 12 ("The existence and effect of a bonded relationship between a biological parent and a child, although a factor to consider, is not dispositive in addressing best interests.") (citing *Bennigno R.*, 233 Ariz. at 351, ¶ 30).

**¶24** The record here reflects Mother failed to protect the Children from ongoing abuse and mistreatment by Cyrus and then proved, through her actions, that her relationship with him was, and remains, more important to her than the health and well-being of the Children. Mother refused to acknowledge even the possibility that Cyrus acted inappropriately toward the Children or that the Children suffered as a result of their interactions with him. She blatantly ignored the Children's fear of Cyrus, ignored specific direction not to allow contact between Cyrus and the Children, and used the Children's love for her to coerce them into hiding Cyrus' presence in the home from their therapist and DCS, even though they were, and remain, terrified of him. Mother then conceived a child with Cyrus and left the state, with Cyrus, without regard to the Children's feelings. The juvenile court did not abuse its discretion in concluding the negative impact of these circumstances on the Children outweighed the potential benefit of maintaining a relationship with Mother.

**¶25** Mother also asserts she could have an appropriate long-distance relationship with Children while residing primarily out-of-state, and any problems arising therefrom could be addressed through the family court. However, the DCS caseworker testified a continued relationship with Mother will exacerbate the trauma the Children already experience as a result of their prior interactions with Cyrus and leaves open the possibility both that the Children will again be abused by Cyrus in the future and that Mother will again turn a blind eye to their safety. Thus, with or without

---

[6] Mother also argues the best interests finding was in error because it "assumes a few things," namely, "that Cyrus harmed the Children" and "Mother failed to protect them." We reject this argument for the reasons stated in Part I, *supra*.

family court orders, the Children will continue to experience anxiety and trauma "over the thought of Cyrus" and his potential to reappear in their lives. Moreover, Mother testified it would be up to the Children to advise the family court if they felt unsafe or insecure in Mother's care "because they're old enough," highlighting her inability and/or unwillingness to identify anxiety in, and stand up for, the Children. Under these circumstances, the juvenile court did not abuse its discretion in concluding that terminating Mother's parental rights was in the Children's best interests.

## CONCLUSION

¶26 The juvenile court's order terminating Mother's parental rights to the Children is affirmed.



AMY M. WOOD • Clerk of the Court
FILED: AA