NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

DONALD O., *Appellant*,

v.

DEPARTMENT OF CHILD SAFETY, C.O., *Appellees*.

No. 1 CA-JV 18-0085
FILED 8-16-2018

Appeal from the Superior Court in Maricopa County
No. JD14724
The Honorable Kerstin G. LeMaire, Judge

**AFFIRMED**

COUNSEL

The Stavris Law Firm PLLC, Phoenix
By Alison Stavris
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By JoAnn Falgout
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge David D. Weinzweig delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Randall M. Howe joined.

---

**W E I N Z W E I G**, Judge:

¶1        Donald O. ("Father") appeals the juvenile court's order severing his parental rights to C.O. based on the length of his incarceration for a felony conviction.  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2        Father and Staci S. ("Mother") are the biological parents of C.O., born in August 2010.[1]  The Department of Child Safety ("DCS") first learned of C.O. in January 2016, when he needed stitches to mend a dog bite he received from a pit bull.  C.O. and Mother lived with six pit bulls.  The bite was not anomalous.  C.O. had required stitches "several times."

¶3        DCS investigated and determined that C.O. lived in unsafe home conditions.  DCS learned that Mother abused methamphetamines.  C.O. had serious behavioral problems.  Just five years old, C.O. was obsessed with guns, crime and violence.  He displayed aggression towards humans and animals.  Mother had lost control of C.O. and asked for help.  C.O. regularly hit Mother and once shot her with a BB gun.

¶4        Meanwhile, Father was in prison from his December 2014 arrest and guilty plea for criminal trespass and felony drug possession (methamphetamines).  He was sentenced to four years in prison, with a historical prior.  He reported for his sentence in June 2015, when C.O. was four years old, and is expected to be released in October 2018, when C.O. will be eight years old.

¶5        Father has an extensive criminal history, including several felonies spanning three decades.  His prior felonies include aggravated assault (Arizona, 2003), possession of cocaine (Utah, 1989) and possession

---

[1]        The juvenile court also terminated Mother's parental rights.  She is not a party to this appeal.

of marijuana (Arizona, 2006). Father has an outstanding arrest warrant in California for aggravated assault.

¶6            C.O. had a relationship with Father before his June 2015 incarceration, but Father demonstrated poor judgment and parenting skills. C.O. admired and sought to imitate his Father. Father welcomed and encouraged the adoration. For instance, Father arranged for C.O. to drink cola from emptied mini-liquor bottles and bought him candy cigarettes. Father described C.O. as "pretty impressionable" and conceded that C.O. "look[ed] at me as a gangster" and "look[ed] at my tattoos" before incarceration. Indeed, C.O. "squiggle[d]" markers on his own face in hopes of matching the "Wanna" and "Fuck?" tattoos above his Father's eyebrows.

¶7            The relationship hinged on age-inappropriate activities, including guns, knives and violent video games. C.O. boasted that "he saw his father shoot someone," although Father denied it. Father and C.O. attended knife and gun shows, where C.O. would "get to pick out [a] little knife" for his collection. C.O. said that "his dad had guns" and "let him shoot them." In conversations with his DCS case manager, C.O. shared no positive or constructive memories about Father; he shared mostly gun-related memories. The court found that C.O. was obsessed with guns, crime and violence at five years old.

¶8            The court characterized Father's employment history as "unstable" before incarceration, and Father called it "sporadic," but he claimed he made enough money to provide for his family. Arrest records confirm that Father had substance abuse issues for almost 30 years; from his 1989 conviction for possession of cocaine to his 2014 conviction for possession of methamphetamines. Father claims he matured in prison and resolved his substance abuse problems, but he admitted to using heroine on his birthday in September 2017, just weeks before the severance hearing.

¶9            C.O. and Father maintained some contact during Father's present incarceration, including a couple of personal visits, plus occasional letters and phone calls. Father sent C.O. a covert communication about the severance action in violation of DCS rules. Father wrote: "We've got to go to court in September. They're trying to take you from me. . . . I don't know if they have ask[ed] you where you want to live, but you can tell them you want to live with me when I get out. You should tell them that if it's what you want to do. It's what I want." Father's letter caused C.O. to melt down and disrupted a potential adoptive placement. It triggered an "aggressive outburst," extreme anger, violence and suicidal thoughts. For instance,

C.O. said he "wanted to just find a gun, so he could shoot his head." DCS terminated all further contact between Father and C.O.

¶10        DCS took temporary custody of C.O. in February 2016 and petitioned the juvenile court to find C.O. dependent as to Father, alleging neglect due to substance abuse and incarceration. Father denied the allegations in the petition but submitted the issue to the court, which found C.O. dependent as to Father.

¶11        The court adopted a plan of family reunification. C.O. cycled through three placements (his family godmother, a licensed foster family and a group home) before his current placement, a licensed foster family, was identified around May 2017.

¶12        DCS moved to terminate Father's parental rights based on A.R.S. § 8-533(B)(4), length of incarceration for a felony offense. The court held a contested two-day severance hearing in November 2017 and February 2018. Several witnesses testified, including Father, the DCS case manager and two therapists. The court then terminated Father's parental rights, finding that DCS proved the statutory ground and that termination was in C.O.'s best interests.

¶13        Father timely appealed. We have jurisdiction pursuant to Ariz. Const. art. 6, § 9, and A.R.S. § 8-235(A).

## DISCUSSION

¶14        Father has a fundamental but not absolute right to custody of his child. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). Parental rights are terminable only when the juvenile court finds clear and convincing evidence of a statutory ground for termination under A.R.S. § 8-533(B) and a preponderance of the evidence shows that termination is in the child's best interests. *Id.* at 248-49, ¶ 12.

¶15        We affirm a severance order of the juvenile court unless the record contains no reasonable evidence to support its factual findings. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286-87, ¶ 16 (App. 2016). Our limited task on appeal accounts for the unique and meaningful role of the juvenile court, which heard and weighed the evidence, observed the parties and witnesses, gauged credibility and resolved questions of fact. *Id.* We neither reweigh the evidence nor substitute our perspective. *Id.*

**A.        Statutory Ground of Incarceration.**

4

¶16　　　　A juvenile court may terminate a parent's rights if it finds by clear and convincing evidence "[t]hat the parent is deprived of civil liberties due to the conviction of a felony . . . if the sentence of that parent is of such length that the child will be deprived of a normal home for a period of years." A.R.S. § 8-533(B)(4).  The statute does not define "a period of years" and Arizona courts have not identified a definitive milepost at which "a sentence is sufficiently long to deprive a child of a normal home for a period of years." *Michael J.*, 196 Ariz. at 251, ¶ 29.  Each case instead depends on its particular facts.  *Id.*

¶17　　　　The Arizona Supreme Court has articulated six factors to determine whether a parent's incarceration compels termination of parental rights.  *Id*. at 251-52, ¶ 29.  The non-exclusive factors are:  (1) the length and strength of any parent-child relationship existing when incarceration begins, (2) the degree to which the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive that child of a normal home, (4) the length of the sentence, (5) the availability of another parent to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue.  *Id*.  We examine each relevant factor in turn.[2]

¶18　　　　*Length and strength of pre-incarceration relationship*.  The juvenile court recognized that Father and C.O. shared a relationship before his June 2015 incarceration, but concluded that "Father exercised poor judgment in exposing the child to violent video games, introduced him to weapons at too young an age, and created an environment for his son which caused the child to act aggressively with his mother, others and animals." The record contains reasonable evidence to support the court's assessment, including testimony from Father himself and the DCS case manager.

¶19　　　　Father's argument is not persuasive.  He points to his own testimony at the severance hearing to prove that he was a "fairly involved parent," painting an idyllic pre-incarceration portrait in which Father fed and bathed the child, and took him fishing, biking and swimming.  The juvenile court, however, heard evidence that contradicted Father's narrative.  And ultimately, based on this evidence, the court rejected Father's description of "an idyllic childhood in which he was constantly there for his son." *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶¶ 11-12 (App. 2002) (deferring to juvenile court's resolution of factual

---

[2]　　　Father does not contest the fifth factor.  Mother is unable to provide C.O. with a normal life because her parental rights have been terminated.

dispute between parents and case manager). We will not reweigh the evidence on appeal or second-guess the juvenile court. *Jennifer S.*, 240 Ariz. at 286-87, ¶ 16.

**¶20** *Relationship during incarceration*. The court found that Father "demonstrated tremendously poor judgment" in his relationship with C.O. during incarceration. The record includes reasonable evidence to support the court's decision. The court heard evidence about Father's painful, disruptive and improper letter to C.O., where Father heaped enormous pressure on the child to make Father's case and preserve his parental status. The letter "unfortunately precipitated a regression in the child's behavior and adversely impacted him." And tellingly, C.O.'s behavior improved after DCS prohibited further contact with Father.

**¶21** Father's argument again misses the mark. He frames and presses an alternative narrative based on other evidence; namely, that he and C.O. have had occasional contact during his incarceration. But the juvenile court heard that evidence and rejected his argument. We will not reweigh the evidence on appeal. *Id.*

**¶22** We separately observe that Father admitted using heroine while incarcerated in September 2017, fully aware that the juvenile court would soon hold the severance hearing (in November 2017) to determine his child's future.

**¶23** *Age of child and deprivation of normal home*. The court found that "Father has been incarcerated for a significant portion of this troubled young man's life," which deprived C.O. of a normal home and would continue to do so. The court also expressed doubt that C.O. would have a normal home life after Father is released "[g]iven Father's lengthy criminal history" and "history of substance abuse," which would hinder Father's search for employment and stable housing and "prevent[ ] [C.O.] from enjoying a permanent home that tends to his emotional, physical and psychological needs."

**¶24** We find reasonable evidence to support the court's finding. Father has been in prison for much of C.O.'s young life. He entered prison in June 2015, when C.O. was four years old, and is expected to be released in October 2018, when C.O. will be eight years old.

**¶25** We are unpersuaded by Father's argument that termination is not warranted because C.O. "has many years before reaching the age of majority; thus, affording the Father years in which he would be able to parent his child." Our decision must account for the historical facts and

Father's extended absence to date, which has deprived C.O. of a normal home for much of his life. *Jeffrey P. v. Dep't of Child Safety*, 239 Ariz. 212, 215, ¶ 14 (App. 2016).

**¶26** *Length of absence.* The court examined Father's length of absence from C.O.'s life; both as of the severance hearing and his ultimate release. *Jesus M.*, 203 Ariz. at 281, ¶ 8. The court also discussed the potential for delayed post-release reunification based on conditions of release and service requirements. *Jeffrey P.*, 239 Ariz. at 214, ¶ 10 (accounting for post-release factors that would further postpone reunification). "Reunification may not occur immediately upon release. Father will be required to demonstrate sobriety, obtain stable verifiable employment, and engage in numerous services before reunification can be considered. This would involve the passage of additional time."

**¶27** We find reasonable evidence to support the court's finding. C.O. was 58 months old when Father entered prison and will be 98 months old when Father is released, meaning Father will have been imprisoned for over 40 percent of C.O.'s lifetime.

**¶28** Father's myopic focus on his impending release is not persuasive because it ignores the past (that is, his 40-month absence from C.O.'s life) while misreading the future (that is, any post-release requirements that further delay reunification). *See id.* at 215, ¶ 14.

**¶29** *Effect of deprivation.* Rather than harm C.O., the juvenile court found that C.O will benefit from a deprivation of Father's presence. "The court finds that this child is in clear need of a safe, stable and loving home to provide for his needs." The record contains reasonable evidence for this conclusion. The DCS case manager testified that C.O. suffered adverse consequences from his contact with Father during incarceration. C.O. apparently understands the harm and informed the case manager that he no longer wishes to "reside with his father." Father does not challenge or address the juvenile court's findings.

## B. Best Interests.

**¶30** Father argues that termination of his parental rights is contrary to C.O.'s best interests. We disagree. The best-interests prong turns on whether "the child would benefit from a severance *or* be harmed by the continuation of the relationship." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 50, ¶ 19 (App. 2004) (quotation omitted).

¶31 The record confirms that severance is in C.O.'s best interests. To begin, the court found clear and convincing evidence of statutory grounds for termination based on Father's incarceration. We have recognized that "[i]n most cases, the presence of a statutory ground will have a negative effect on the children." *Maricopa Cty. Juv. Action No. JS-6831*, 155 Ariz. 556, 559 (App. 1988).

¶32 A continued relationship with Father would also rekindle C.O.'s harmful exposure to "extremely violent video games, a criminal lifestyle, and the glorification of weapons." C.O. suffered serious behavioral problems after his prior exposure. The DCS case manager testified that C.O. regressed after his prior contact with Father and evinced a desire to emulate gangster behavior.

¶33 The court further emphasized that C.O. has excelled in his current placement with a caring and responsible foster family that meets his needs. *See Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 350, ¶ 23 (App. 2013) (juvenile court "may consider whether the current placement is meeting the child's needs"). C.O. "seems to be thriving with a stable, loving home." "[H]is behavior is greatly improved and he is no longer struggling academically." The DCS case manager testified that C.O. has gained consistency and structure, along with a positive role model.

¶34 And last, severance makes it possible for C.O. to be adopted. *See Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98, ¶ 10 (App. 2016) (severance "make[s] the Children eligible for adoption"). The court recognized that C.O.'s current foster family intends to adopt him if his behavior continues to improve. This provides "the added benefit of stability and permanency."

¶35 The record contains reasonable evidence to support the juvenile court's best-interests finding.

**CONCLUSION**

¶36 We affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA