NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

JESSICA L., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, J.L., *Appellees*.

No. 1 CA-JV 20-0176
FILED 10-6-2020

---

Appeal from the Superior Court in Yavapai County
No. P1300JD201900070
The Honorable Anna C. Young, Judge

**AFFIRMED**

---

COUNSEL

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge James B. Morse Jr. and Judge Paul J. McMurdie joined.

---

**C R U Z**, Judge:

**¶1**        Jessica L. ("Mother") appeals the superior court's order terminating her parental rights.  For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

**¶2**        Mother and Jacobi L. ("Father") are the natural parents of Josiah, born in Virginia in 2015, and James, born in Arizona in September 2019.[1]  Shortly after James was born, the Department of Child Safety (the "Department") received two calls reporting that James' brother Josiah had been abused in Virginia and raising concerns about the potential for abuse of James.  At birth, James was diagnosed with Pierre Robin sequence, which resulted in a shortened lower jaw that required surgery a week after birth, and a cleft palate that required corrective surgery at approximately nine or ten months of age.  James remained in the hospital "due to his severe medical needs."  Based on reports of the prior abuse of Josiah—including a brain injury and multiple fractures due to non-accidental trauma—and on a review of documents from Virginia's Child Protective Services, the Department initiated dependency proceedings and petitioned to terminate Mother's and Father's parental rights to James just two weeks after his birth.  The petition to terminate their parental relationships alleged Mother and Father had willfully abused or failed to protect Josiah from willful abuse pursuant to Arizona Revised Statutes ("A.R.S.") sections 8-201(2) and 8-533(B)(2) and that James' congenital disorders made him particularly susceptible to abuse and presented a substantial risk of harm.

**¶3**        When Mother and Father met online, Father lived in Virginia near his family, and Mother lived in Arizona near hers.  Father traveled to Arizona, where they entered a covenant marriage in 2013; they moved to Virginia when Father struggled to find work in Arizona.  After Josiah was

---

[1]        The children's names have been changed to a pseudonym to protect their privacy.

born, Mother became concerned about Father's ability to care for the infant. She noted Father was "a little rough with him." Father pulled the child's legs to straddle Father's chest when holding him, held the child's legs in an uncomfortable position when changing a diaper, held the child down when putting him into the car seat, and picked up the child by the neck with one hand. Although Mother immediately interceded and attempted to coach or correct Father's handling of the child, Father often rejected her input. Because Father frequently became frustrated with Josiah, Mother undertook most of the child's care. Despite Mother's concerns, Father continued to care for Josiah unsupervised on occasion.

¶4        Josiah's pediatrician examined him frequently, once because he seemed dehydrated and several times to monitor his weight loss and slow weight gain. When Josiah was seven weeks old, Mother and Father sought medical care because he had been unusually fussy and was holding his right leg abnormally. The night before, Father had changed Josiah's diaper, and the child gave a "shrill shriek." Doctors determined that Josiah had "multiple fractures" in various stages, including acute fractures in both femurs, several healing rib fractures, and healing fractures to the left tibia and left forearm. An MRI indicated "areas compatible with chronic small hemorrhages [in] both frontal lobes." Doctors determined "[Josiah] appears to be a victim of non-accidental trauma." Neither parent could account for the injuries except for one or both of the broken femurs; Mother and Father each suggested Father may have caused that injury when changing the child's diaper or when he straddled the child's legs across his chest. A Virginia court ordered Josiah be placed with his paternal grandparents and issued a protective order against Mother and Father, permitting contact with Josiah "in the discretion" of his paternal grandmother. Josiah has not sustained any additional fractures after being placed with his grandparents. As of the termination proceeding, he remains in Virginia in his paternal grandparents' care.[2]

¶5        In 2019, while Mother was pregnant with James, Mother and Father moved to Arizona to be nearer to Mother's family. Mother still had concerns about Father's ability to safely care for an infant and hoped to have support from her family in caring for James. Approximately two months after James was born, and after termination proceedings were commenced,

---

[2]        Mother and Father faced criminal child abuse charges in Virginia, but prosecutors there entered a *nolle prosequi* declaration, essentially tabling the charges barring additional evidence.

Father returned to Virginia and stopped cooperating with the Department and his Guardian ad Litem.[3]

¶6            Based on the injuries suffered by Josiah and the Virginia court's termination of their parental rights, the Department amended its petition for termination to allege both parents had abused or neglected or failed to protect a child from abuse or neglect, all which presented James with a substantial risk of harm. *See* A.R.S. § 8-533(B)(2). At the dependency and severance trial, Mother testified that she had filed for divorce from Father, citing abandonment. *See* A.R.S. § 25-903 (outlining limited grounds to dissolve a covenant marriage). Two medical experts testified that Mother suffers from Ehlers-Danlos Syndrome ("EDS"), which can be "associated with bone fragility." Mother sought evaluations of Josiah for EDS from both experts in 2017. Both testified that Josiah might also have EDS, which could explain his serious injuries; neither expert, however, actually examined him and only reviewed medical records provided by Mother.

¶7            After a three-day hearing, the superior court found James dependent as to Mother and terminated Mother's and Father's parental rights. Mother timely appeals the termination of her rights, and we have jurisdiction pursuant to A.R.S. § 12-120.21(A)(1).

## DISCUSSION

¶8            Mother appeals the superior court's findings that she abused or neglected a child or failed to protect a child from abuse or neglect; that James would be at a substantial risk in her care; and that termination is in the best interests of James. Termination may be appropriate if the superior court finds, by clear and convincing evidence, at least one of the statutory grounds for termination in A.R.S. § 8-533(B), and, by a preponderance of the evidence, termination to be in the best interests of the child. *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 449, ¶ 12 (App. 2007). We view the evidence "in the light most favorable to sustaining the juvenile court's findings and will affirm unless, as a matter of law, no reasonable evidence supports those findings." *Ariz. Dep't of Econ. Sec. v. Rocky J.*, 234 Ariz. 437, 440, ¶ 12 (App. 2014).

---

[3]      The superior court found James dependent as to Father in December 2019, after Father failed to appear to a pretrial conference without cause. Father did not attend the trial but was represented by an attorney and Guardian ad Litem. Following the trial, the court terminated his parental rights. Father is not a party to this appeal.

I.      Termination Pursuant to A.R.S. § 8-533(B)(2)

¶9        Under A.R.S. § 8-533(B)(2), the superior court may find a parent unfit if the parent "neglected or wilfully abused a child," including circumstances in which the parent "knew or reasonably should have known that a person was abusing or neglecting a child." The abused or neglected child may be a child other than the subject of the termination proceedings. However, in determining that a parent is unfit to parent a child based on the abuse or neglect of another child, "[i]nherent . . . is a demonstrable connection between the ground for termination and the harm or risk of harm to a child." *Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 227, 229, ¶¶ 13, 24 (2020). The statute requires "the juvenile court to explicitly find[] that a parent's neglect or abuse of any child demonstrates that the parent is similarly unfit to parent the child at issue." *Id.* at 230, ¶ 25.

¶10       Mother first contends the superior court erred in finding Mother abused, neglected, or failed to protect Josiah from abuse or neglect. She cites the testimony of the medical experts who surmised Josiah's injuries could be contributed to EDS. The court, however, found that Mother's argument that Josiah had EDS was not "credible or supported by the evidence." As the court noted, a geneticist in Virginia evaluated Josiah but "did not detect a pathogenic variant in [the] gene[s] associated with osteogenesis imperfecta and decreased bone density." The court also noted Josiah had not suffered from any additional fractures since removal from the parents' care. Mother essentially asks us to reweigh the evidence regarding Josiah's injuries; this we will not do. "The resolution of such conflicts in the evidence is uniquely the province of the juvenile court as the trier of fact . . . ." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12 (App. 2002). Furthermore, the record includes significant evidence that Father's rough handling caused at least one of Josiah's fractures, and Mother admitted "the night before [Josiah] was taken to the hospital where his injuries were diagnosed she heard the child cry out while Father was taking care of the child," and that she had "seen Father hold the child by the neck but continued to leave [Josiah] with Father unsupervised." Despite witnessing Father "mishandling" Josiah on several occasions and knowing Father displayed "ignorance to babies and how they should be cared for," Mother continued to allow Father to provide some care for the child. The record supports the court's findings that Mother knew or reasonably should have known that Father was abusing or neglecting Josiah. We find no error.

¶11       Next, Mother contests the superior court's findings that Mother lacked protective capacity, and that James would be "at substantial

risk of harm in Mother's care." The court cited concerns about Mother's relationship with Father, her "minimization of Father's actions that resulted in" Josiah's injuries, and James' young age and special needs. The court noted that James "is vulnerable, if not more vulnerable, as [Josiah] due to [James'] age and medical issues." The record supports these findings. Although Mother filed for divorce, she did so after the trial began, and the record shows she had previously separated from Father briefly in Virginia before reuniting with him. Mother testified she returned to Father after researching EDS and determining "what I saw happen" between Father and Josiah "didn't really explain any of his injuries or very few of his injuries." In a report prepared for the superior court, the Department noted that although Mother participated consistently in coaching and counseling services, "she is engaging while holding onto a perception of her situation that is likely inaccurate, and therefore is not progressing toward sustainable behavioral changes necessary to parent [James] safely." James is a particularly vulnerable child, as he is young and was born with special medical needs. The superior court did not abuse its discretion in finding Mother lacked appropriate protective capacity, placing James at substantial risk of harm. *See Sandra R.*, 248 Ariz. at 231, ¶ 31 ("[T]he court sufficiently imputed the risk of harm to the other children based on [the abused child's] serious injuries and Mother and Father's lack of credibility in their assurances that they would insulate their other children from abuse.").

## II.     Best Interests

**¶12**          Mother argues the superior court erred in finding termination to be in the best interests of James. "[T]he best interests inquiry focuses primarily upon the interests of the child, as distinct from those of the parent" deemed unfit. *Kent K. v. Bobby M.*, 210 Ariz. 279, 287, ¶ 37 (2005). The superior court "must protect a child's interest in stability and security." *Id.* at 286, ¶ 34 (citation omitted). Termination of the parent-child relationship is in the best interests of the child if the child will benefit from termination or will be harmed if the relationship continues. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 13 (2018).

**¶13**          The superior court determined that James would be at a substantial risk of harm if he were in Mother's care. *See Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 350, ¶ 23 (App. 2013) ("The juvenile court . . . may take into account that '[i]n most cases, the presence of a statutory ground will have a negative effect on the children[.]'" (quoting *In re Maricopa Cnty. Juv. Action No. JS-6831*, 155 Ariz. 556, 559 (App. 1988)). The superior court also found that James was in an adoptive placement with his maternal grandfather and wife, and the placement was meeting his needs.

*See Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4-5, ¶ 16 (2016) ("It is well established in state-initiated cases that the child's prospective adoption . . . can support a best-interests finding."). Again, we decline Mother's invitation to reweigh the evidence. Viewed in a light most favorable to the superior court's findings, this record contains sufficient evidence to support the finding that termination is in the best interests of James.

## CONCLUSION

**¶14**    For the foregoing reasons, we affirm the superior court's order terminating Mother's parental rights.



AMY M. WOOD • Clerk of the Court
FILED:    AA