NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO R.C.

No. 1 CA-JV 24-0008
FILED 06-18-2024

---

Appeal from the Superior Court in Yavapai County
No. P1300JD202200021
The Honorable Anna C. Young, Judge

**AFFIRMED**

---

COUNSEL

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant Father*

Law Office of Florence M. Bruemmer PC, Anthem
By Florence M. Bruemmer
*Counsel for Appellant Mother*

Arizona Attorney General's Office, Tucson
By Dawn Rachelle Williams
*Counsel for Appellee DCS*

Myers & Associates PLLC, Scottsdale
By Jamie N. Myers
*Counsel for Appellee Child*

Law Offices of Stacie B. Robb PLLC, Prescott
By Stacie B. Robb
*Counsel for Appellee Child Guardian*

_____

**MEMORANDUM DECISION**

Judge Michael S. Catlett delivered the decision of the Court, in which Presiding Judge Angela K. Paton and Judge James B. Morse Jr. joined.

_____

**C A T L E T T**, Judge:

¶1          Patricia V. ("Mother") and Robert C. ("Father") (together, "the Parents") appeal the juvenile court's termination of their parental rights as to R.C. ("Child").  Because the record sufficiently supports the juvenile court's findings, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2          Mother and Father are Child's parents.  The Department of Child Safety ("DCS") took custody of Child because the Parents lived in a tent and Mother exposed Child to marijuana while pregnant.  In May 2022, the Parents pled no contest to DCS's dependency petition.  The juvenile court found Child dependent because the Parents had neglected Child's basic needs and their own mental health.

¶3          A psychologist evaluated Mother and diagnosed her with post-traumatic stress disorder, unspecified personality disorder with borderline and anti-social traits, stimulant-use disorder (methamphetamine type substance), and an unspecified cannabis-related disorder.  The psychologist expressed concern about Mother's "attitudes and behaviors, including failure to conform to social norms with respect to lawful behaviors and a history of consistent irresponsibility."  The psychologist acknowledged Mother had "a number of personal strengths," but he was "very guarded" that she could safely parent in the future.  The psychologist recommended Mother receive mental health services, therapy, drug and alcohol testing, parenting services, and other support, including transportation and housing resources.

¶4          The same psychologist evaluated Father and diagnosed him with unspecified neurocognitive disorder, unspecified bipolar and related disorder, stimulant-use disorder (methamphetamine), unspecified personality disorder with mixed traits, and unspecified cannabis-related disorder.  The psychologist warned that Father's traits "can lead to acute harm" and/or "impairment over longer periods of time[.]"   The

psychologist recommended that Father receive drug and alcohol testing, mental health services, therapy, substance abuse treatment, anger management services, parenting classes, and other support, including transportation and community resources.

¶5         DCS provided the Parents with psychological evaluations, mental health services, drug testing, parenting services, therapy, and anger management services.   On five occasions during the dependency proceedings, DCS requested that the juvenile court find that DCS was making reasonable efforts to finalize permanency.  Neither of the Parents objected to DCS's requests, although on one occasion, Father sought clarification about obtaining transportation.  The juvenile court repeatedly found that DCS was making reasonable efforts.

¶6         The Parents provided DCS and the court with updates on their housing situation.  When they started doing so, the Parents lived in a recreational vehicle.  In August 2022, they informed DCS they had obtained a generator and a transmission-rebuild kit.   In September 2022, they informed the court they may have found a place to park their vehicle where they would have water and electricity.  However, in January 2023, they informed the court they no longer had a place to park.  In May 2023, the Parents claimed that the vehicle was connected to utilities and the court, in a minute entry, documented that housing was "stable."  The court ordered DCS to conduct a walkthrough within two weeks of being informed the Parents were ready for an inspection.  The Parents never provided that notification.

¶7         During visitations, the case aid reported that the Parents smelled of marijuana or cigarettes.  DCS initially described Child as healthy, but Child was later diagnosed with pneumonia and eventually had to be placed on a feeding tube.

¶8         In June 2023, Mother self-reported to her therapist that she had bipolar symptoms and mania, and that she loses track of time when one of her other personalities "takes over," although she felt "a little better" than the previous year.  In July 2023, Father pled guilty to aggravated driving while under the influence of methamphetamine.  In August 2023, DCS petitioned to terminate the Parents' rights.

¶9         At the termination hearing, DCS described the Parents' participation in services as inconsistent.  DCS stated Mother completed parenting classes and substance abuse treatment but did not complete all drug testing and routinely tested positive for THC.  Despite participating

in anger management counseling, Mother continued to escalate problems. DCS also informed the court that a service intended to help teach Mother adult skills was initially closed because she "misus[ed] the time and resources for the provider."

¶10        DCS stated Father did not complete substance abuse treatment or maintain sobriety. In addition to missing some tests, he tested positive for THC and methamphetamine. DCS testified that he did not consistently participate in therapy, which prevented him from participating in anger management services, and he did not engage in parenting classes until after the termination petition, when he was in prison.

¶11        DCS testified to having "many discussions" with the Parents about housing. The Parents were unemployed and each received approximately $900 a month in social security benefits. Father admitted to having conversations with DCS about housing options but did not follow up after initially being told all spots were full. Father also admitted that it was difficult to get into certain housing programs because he was on probation for disorderly conduct with a weapon.

¶12        Mother testified she was paying for three storage facilities, in a monthly amount approximately the same as it would cost for a shared living space. But she refused to live in a shared space with another woman because Father was not permitted. Mother testified that, at the time of the hearing, the Parents' recreational vehicle had water leaks, potentially had black mold but had not been checked, and was not connected to water, power, or sewer services. Father testified he thought he could get housing within two months because he would have more opportunities after being released from prison.

¶13        Mother did not know all of Child's medical needs, stating she had been "asking since the beginning of this case." She was unaware of the frequency or general timeframe of Child's medical appointments. She did not know how many times a day Child needed to be fed. But Mother acknowledged she had a notebook the Child's foster placement provided that included updates and details about Child's medical providers. Despite knowing Child's breathing was impacted, Mother admitted that she continued to smoke because of stress, but said she would quit smoking if Child was returned to her custody. In addition to smoking cigarettes, she vaped marijuana.

¶14        The psychologist who originally diagnosed Mother testified that he downgraded his view of her mental health from "very guarded to

poor" based on the passage of time and lack of progress. He explained that the difficulty the Parents had in providing for their own needs would apply to parenting and create additional concerns about managing Child's medical needs. The psychologist testified there were no additional services that would prevent termination.

¶15        DCS stated that Child's foster home was an adoptive placement and termination would allow Child to remain with those who understand his medical needs.

¶16        The court found that DCS proved by clear and convincing evidence that the Parents' rights should be terminated due to an inability to discharge parental responsibilities because of mental illness and because Child had been in an out-of-home placement for fifteen months. *See* A.R.S. § 8-533(B)(3) and (B)(8). The court commented that "these cases are not about whether or not the parents love their children . . . . It comes down to . . . the grounds for termination . . . and then . . . [C]hild's best interest."

¶17        The court found Mother was "unable to meet the basic parenting standards for [Child]" or demonstrate an ability to "meet her own needs." The court found there were "reasonable grounds to believe that [the Parents' mental illness] will continue for a prolonged indeterminate period." The court concluded that DCS provided the Parents with a "multitude of services" but, after fifteen months, they were unable to find suitable housing. The court determined DCS demonstrated by a preponderance of the evidence that termination would be in Child's best interests because it would further the plan of adoption and provide permanency and stability.

¶18        Mother and Father timely appealed. We have jurisdiction. *See* A.R.S. § 8-235(A).

## DISCUSSION

¶19        The Parents argue they were not provided sufficient reunification services. Mother also argues there was insufficient evidence to terminate her rights on either of the statutory grounds the court relied on and that termination was not in Child's best interests. Father does not challenge the sufficiency of the evidence supporting the statutory grounds for termination or the court's best interests finding.

¶20        "Parents have a fundamental right to raise their children as they see fit, but that right is not without limitation." *Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 79 ¶ 14 (App. 2001). Before terminating a parent's

rights, the juvenile court must find by clear and convincing evidence that at least one of the grounds in A.R.S. § 8-533(B) exists and must find by a preponderance of the evidence that termination is in the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 288 ¶ 41 (2005); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249 ¶ 12 (2000). We will "affirm a termination order unless the juvenile court abuses its discretion or the court's findings are not supported by reasonable evidence." *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474 ¶ 14 (2022). We will accept the juvenile court's factual findings if supported by reasonable evidence and inferences. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, ___ ¶ 30 (2023). We will not disturb the juvenile court's conclusions for insufficient evidence unless no one could reasonably find the evidence to be sufficient. *Id.* at ___ ¶ 31.

## I.  Reunification Services

**¶21**     The Parents argue that DCS did not provide sufficient reunification services because they were not provided with a housing subsidy. A parent who does not contemporaneously object to reunification services cannot later challenge that finding on appeal. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178–79 ¶ 16 (App. 2014); *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 349 ¶ 19 (App. 2013). Here, the juvenile court considered five motions requesting confirmation that DCS was making reasonable efforts to finalize permanency. The court found on each of those five occasions that DCS had made reasonable efforts. *See Shawanee S.*, 234 Ariz. at 179 ¶ 17. Neither of the Parents objected to any of the five motions nor requested a housing subsidy in response. *See id.*; *Bennigno R.*, 233 Ariz. at 349 ¶ 19. Thus, the Parents waived their deficient services argument.

**¶22**     Notwithstanding waiver, the record contains sufficient evidence that DCS made reasonable and diligent efforts to address the Parents' housing situation. *See Bennigno R.*, 233 Ariz. at 350 ¶ 20. The juvenile court must "consider the totality of the circumstances when determining whether DCS has made diligent efforts." *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23 ¶ 49 (App. 2019). DCS is required to provide a parent with "the time and opportunity to participate in programs designed to help her become an effective parent." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). But DCS is not "required to provide every conceivable service[.]" *Id.*

**¶23**     DCS testified that it had "many discussions" with the Parents about housing, and the Parents implied during their testimony that they

had such conversations. The Parents made choices that impacted their ability to afford housing or limited available housing options. For example, Mother admitted that she rented multiple storage units costing $400 per month and spent $200 per month on marijuana, which reduced the amount of funds available to obtain stable housing. She also testified that she refused to move into a shared living space because she would have to share the room with another woman, where Father was not permitted. The Parents were asked to leave a recreational vehicle park due to noise complaints about their arguing. And Father admitted that certain housing programs would not accept the Parents because he was on probation for disorderly conduct with a weapon.

¶24 Prior to the termination hearing, the Parents told DCS and the court that their recreational vehicle would be ready to meet Child's needs. They informed the court that they had (1) a place to park that would provide water and electricity, (2) obtained a generator and a transmission rebuild kit, and (3) connected their recreational vehicle to utilities. The Parents informed the court that the recreational vehicle was "stable" and would soon be ready for an inspection. In response, the court ordered DCS to inspect the vehicle when the Parents were ready. The Parents never requested an inspection.

¶25 The court found that DCS provided Mother and Father with a "multitude of services." DCS provided the Parents with psychological evaluations, mental health services, drug testing, parenting services, therapy, and anger management. A psychologist confirmed, however, that there were no additional services to offer either of the Parents to prevent termination. Reasonable evidence supports the court's conclusion that DCS provided the Parents with diligent reunification services. *See Brionna J.*, 255 Ariz. at ___ ¶ 30.

## II. Mental Illness

¶26 Mother argues the court erred in terminating her parental rights under the mental illness ground because she claims the hearing testimony focused on her drug use, finances, and hygiene. To terminate a parent's rights due to mental illness, DCS is required to prove a parent was "unable to discharge parental responsibilities because of mental illness . . . and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period." A.R.S. § 8-533(B)(3).

¶27 Mother downplays the evidence about her mental health struggles. A psychologist diagnosed her with post-traumatic stress

disorder, unspecified personality disorder with borderline and anti-social traits, stimulant-use disorder (methamphetamine type substance), and unspecified cannabis-related disorder. The record also reflects that she reported having bipolar symptoms and mania and losing track of time when one of her other personalities "takes over." The psychologist was concerned about her "attitudes and behaviors, including failure to conform to social norms with respect to lawful behaviors and a history of consistent irresponsibility." By the time of the termination hearing, the psychologist had downgraded Mother's mental health status from "very guarded to poor" based on her lack of progress.

**¶28** The psychologist explained that Mother's difficulty in managing her needs would result in an inability to manage Child's needs. Mother's testimony supports that concern—she was unaware of Child's medical needs, his medical appointments, and his feeding schedule. Mother admitted that she continued to smoke because of stress, even after Child had severe breathing complications.

**¶29** The record contains reasonable evidence supporting the mental illness ground for termination. *See Brionna J.*, 255 Ariz. at ___ ¶ 30. We therefore need not address the other statutory ground for termination the juvenile court found. *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 376–77 ¶ 14 (App. 2010).

## III. Best Interests

**¶30** Finally, Mother argues the court erred in making a best interests finding by not considering the "type of parenting bond" she has with Child. Termination is in a child's best interests if DCS proves by a preponderance of the evidence that the child will benefit from, or be harmed without, termination. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150 ¶ 13 (2018). The juvenile court must consider the totality of circumstances at the time of termination. *Id.* at 150–51 ¶ 13.

**¶31** "It is well established in state-initiated cases that the child's prospective adoption is a benefit that can support a best-interests finding." *Id.* (quoting *Demetrius L. v. Joshlynn F.*, 239 Ariz 1, 4 ¶ 16 (2016)). DCS testified that Child had an adoptive placement who would support his medical needs. The court determined termination would be in Child's best interests because it would further the plan of adoption and provide "permanency and stability." Reasonable evidence supports the court's finding that termination was in Child's best interests.

## CONCLUSION

**¶32**        We affirm the termination of Mother and Father's parental rights as to Child.



AMY M. WOOD • Clerk of the Court
FILED:    AGFV