NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO K.M.

No. 1 CA-JV 24-0041

FILED 04-17-2025

Appeal from the Superior Court in Maricopa County
No.  JD41280
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

COUNSEL

Maricopa County Office of the Public Advocate, Mesa
By Seth Draper
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Dawn R. Williams
*Counsel for Appellee*

**MEMORANDUM DECISION**

Presiding Judge Cynthia J. Bailey delivered the decision of the Court, in which Judge Anni Hill Foster and Judge Angela K. Paton joined.

**B A I L E Y**, Judge:

¶1        Deandra B. ("Mother") appeals the termination of her parental rights to K.M. ("Child") on the statutory grounds of neglect and

fifteen months' out-of-home placement. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(2), (8)(c). For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

**¶2**      We review the facts in the light most favorable to upholding the superior court's order. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).[1]

**¶3**      Mother is the biological parent of Child, born in 2015.[2] In 2019, Mother was allegedly "sold" to Anthony C.[3] While Mother was with Anthony C., Child witnessed numerous domestic violence incidents between them. Realizing that her continuing association with Anthony C. threatened Child's safety, Mother at times placed Child in the homes of others, including Mother's grandmother.

**¶4**      In September 2021, the Department of Child Safety ("DCS") found Child dirty and not wearing underwear after an unknown person dropped Child off at Mother's grandmother's home in the middle of the night. Child stated that "Tony" had hurt her and hurt Mother, and that she had not seen Mother in several days. Child also stated that "Tony" had hurt her "cookie" and pointed to her genital area.

**¶5**      DCS removed Child from Mother's care and filed a dependency petition, alleging that Mother was unwilling or unable to provide proper and effective parental care due to her history of leaving Child with inappropriate caregivers. DCS's petition also cited concerns with Mother's mental health and domestic violence history with Anthony C. Mother waived her right to contest the dependency when she failed to appear at the January 2022 pretrial hearing. Child was adjudicated dependent as to Mother, and the court approved a case plan of family reunification.

---

[1] Paragraphs 3–13 incorporate facts provided in DCS's second set of additional document disclosures, which were made in November 2024.

[2] The superior court also terminated the parental rights of Child's biological father, who is not a party to this appeal.

[3] Mother testified at trial that she was "sold" to Anthony C. against her will. In previous reports to her probation officer and service providers, Mother indicated that she was a victim of sex trafficking.

¶6        Over the next two years, Mother remained in what the superior court described in its termination order as a "nearly constant crisis." Anthony C. frequently beat, kicked, and choked Mother, leaving her with marks and bruises. Anthony C. took her clothing, phones, and identification, and he dictated what Mother wore and where she could go. When Mother would attempt to leave by going to shelters or family members' homes, Anthony C. would find her.

¶7        DCS offered various reunification services to Mother, including drug and alcohol testing, Family Connections, the Nurturing Parenting Program, supervised visitation, case management services, and transportation assistance. DCS also coordinated with Mother's existing services, which included mental health services from COPA Health, domestic violence and shelter assistance through the City of Phoenix Advocacy Center, and domestic violence counseling and additional mental health services through the Maricopa County Probation Department. The superior court found, however, that Mother remained "[c]aught in the cycle of domestic violence coupled with inconsistent engagement with her mental health provider," resulting in her "vacillating between wanting help and failing to do what was necessary to receive the help she so desperately needed and continues to need."

¶8        Over the course of the dependency, Mother went to at least four different domestic violence shelters, but she was evicted each time for failing to follow shelter rules and behaving erratically and irrationally toward staff. Mother refused to submit to drug and alcohol testing and minimally engaged with Family Connections. She also closed out of the Nurturing Parenting Program for lack of attendance, having attended only one session by the time the program was halfway over. Mother blamed her minimal engagement on her providers' failure to answer her phone calls, and on DCS's failure to provide consistent transportation. Meanwhile, her providers reported that they made multiple unsuccessful outreach attempts—and when they succeeded in setting up sessions, she often failed to attend or cancelled them. Until the last few months of the dependency, Mother did not receive mental health services consistently through COPA Health due to her failure to stay in contact with her mental health case manager.[4]

---

[4] In a January 2023 team decision meeting, a COPA Health representative clarified that COPA Health did not have substance abuse-related concerns with Mother, but it was providing mental health medications to her. The

¶9 Mother began supervised visitation in December 2021, but Child's initial foster placement cancelled several of her visits. DCS became concerned about the initial foster placement and moved Child to a different placement in January 2022. Mother's visits continued for about another month, when her referral closed out due to her no-calls and no-shows. Mother received another referral for supervised visitation in June, but it soon closed out due to her lack of engagement. Mother subsequently experienced gaps in visitation due partly to DCS's shortage of visitation providers.

¶10 When Mother's visits resumed in October, they were sporadic due to her frequent no-shows and cancellations. Mother had several virtual visits in March 2023, and although each visit was scheduled for one hour, Mother ended nearly all after less than fifteen minutes. For one virtual visit, Mother ended with: "I am going to have to go soon. He's coming back." Her visitation provider expressed concern about Mother appearing at visits with visible injuries, including black eyes and bumps on her head. Mother continued to attribute her poor attendance to DCS's failure to provide reliable transportation, citing at least one occasion when she was left stranded at the end of a visit. When DCS followed up with its transportation provider regarding Mother's complaints, the provider responded that the issue was Mother's failure to show up or arrive on time for transportation.

¶11 Due to Mother's poor attendance record and the provider's concerns regarding Mother's visible injuries, Mother's supervised visits were closed out in April 2023. Mother was then incarcerated four times between May and September 2023—once for assaulting Anthony C. in violation of an order of protection he had obtained against her.

¶12 In October 2023, the superior court changed the case plan to termination and adoption. During a two-day contested trial in January 2024, Mother testified she was about to begin domestic violence counseling, working on securing employment, and taking medication that helped her feel calmer and less erratic. She also testified she was residing at her uncle's house and that it had been three weeks since she had contact with Anthony C., but she admitted Anthony C. knew the location of her uncle's house.[5]

representative explained that Mother was required to attend medication checks every three months but had not consistently done so.

[5] While Mother testified that she resided with her "uncle," she reported at other times that he was her maternal great-uncle.

Mother had previously reported that her uncle abused her, and that he was friendly with Anthony C. and "welcome[d]" Anthony C. into his home.

¶13　　　　The superior court terminated Mother's parental rights based on the statutory grounds of neglect and fifteen months' out-of-home placement. Mother timely appealed.

¶14　　　　With its answering brief, DCS advised that it discovered a previously undisclosed document in its Guardian electronic portal service. We granted Mother's motion to stay the appeal and remanded to the superior court to consider whether to set aside the termination order on the ground of newly discovered evidence. Following Mother's motion to set aside the termination order, the superior court held a hearing on June 5, 2024. After the hearing, DCS disclosed four more documents. DCS later disclosed seven more documents. All twelve missing disclosures—the initial document in DCS's answering brief, followed by the eleven additional documents—were supervised visitation notes dated from September 2023 to February 2024. In response to each of the new disclosures, Mother filed supplemental motions to set aside the termination.

¶15　　　　After considering the additional supervised visitation notes, the superior court entered a final order denying Mother's request to set aside the termination. The court found that the additional evidence underscored Mother's love for Child and her appropriate behavior, kindness, and affection toward Child during supervised visits. But because the new documents did not address the court's reasons for ordering termination, the court found the new evidence was merely cumulative and would not have changed its decision. Mother filed a second notice of appeal. This court lifted the stay of her appeal and permitted the parties to file supplemental briefing.

¶16　　　　In September 2024, we ordered DCS to provide an affidavit affirming its disclosures for this case were complete. DCS moved to suspend the appeal because it was unable to meet the affidavit requirement. We granted the motion in part and stayed the appeal. DCS completed the disclosure and filed the corresponding affidavit in November.

¶17　　　　In its latest disclosure, DCS provided over three hundred pages of additional documents comprised of emails between DCS and service providers, supervised visitation records, Family Connections progress reports, Seneca search results describing Mother's family connections, a team decision-making summary report, case plans, and case

notes. Mother moved to extend the stay to allow counsel additional time to review the updated disclosure. We granted Mother's motion, continuing the stay to December 30, 2024.

**¶18** On November 27, Mother filed a third supplemental motion to set aside the termination order. On December 27, Mother moved to extend the stay because the superior court had not yet issued a ruling. On December 30, the superior court denied Mother's motion to set aside, again finding the newly disclosed documents were merely cumulative and would not have changed its decision. We denied Mother's motion to extend the stay and lifted the stay of her appeal. We also permitted each party to file a second supplemental brief.

**¶19** We have jurisdiction over Mother's appeal under Article 6, Section 9, of the Arizona Constitution; A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1); and Rule 601 of the Arizona Rules of Procedure for the Juvenile Court.

## DISCUSSION

**¶20** To terminate parental rights, a court must find clear and convincing evidence of at least one statutory ground in A.R.S. § 8-533(B) and must find by a preponderance of the evidence that termination is in the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005). "The [superior] court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002) (citation omitted). We will affirm a termination order unless clearly erroneous. *Id.*

I.      Reunification Services

**¶21** In her opening brief, Mother challenges the superior court's finding that DCS made a diligent effort to provide her with appropriate reunification services. Mother does not challenge the underlying termination grounds of neglect and fifteen months' out-of-home placement.

**¶22** Under A.R.S. § 8-533(B)(8)(c), a court may terminate a parent's rights when: (1) "[t]he child has been in an out-of-home placement for a cumulative total period of fifteen months or longer pursuant to court order or voluntary placement," (2) "the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement," and (3) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future."

6

To terminate on this ground, the court must also find that DCS "made a diligent effort to provide appropriate reunification services." A.R.S. § 8-533(B)(8).

**¶23** Citing *Bennigno R. v. Arizona Dep't of Econ. Sec.*, 233 Ariz. 345, 349–50, ¶ 19 (App. 2013), and *Shawanee S. v. Arizona Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶ 18 (App. 2014), DCS argues Mother has waived her challenge, contending Mother should have raised the issue before trial rather than for the first time in her trial testimony and closing argument.

**¶24** Assuming *arguendo* that *Bennigno R.* and *Shawanee S.* do not compel a waiver finding here, we discern no error. The superior court considers the totality of the circumstances in evaluating whether DCS made diligent efforts to provide reunification services. *See Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23, ¶ 49 (App. 2019). Diligent efforts require, at a minimum, for "DCS to identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances *as they arise throughout the time-in-care period*, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Id.* at 23, ¶ 50 (citation omitted). DCS must provide a parent "with the time and opportunity to participate in programs designed to help her become an effective parent," but it need not "provide every conceivable service or [ ] ensure that a parent participates in each service it offers." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994) (citation omitted).

**¶25** Mother argues that DCS's supervised visitation and parenting skills services were inadequate because DCS purportedly failed to provide reliable transportation to them. Although DCS's transportation service failed to pick her up on at least one occasion, Mother concedes her absenteeism was partly due to her own failure to show up or arrive on time for transportation. Mother does not explain what proportion of her failed transportation was DCS's fault, rather than her own, and thus cannot demonstrate she was prejudiced by the service's unreliability.

**¶26** Mother also argues that DCS's shortage of visitation providers left her with unacceptable gaps in visitation. DCS's provider shortage contributed to at least two gaps lasting two months each. But Mother missed many visits due to her own no-shows and cancellations, and she lost more visitation time by cutting her virtual visits short and being incarcerated at various times. Mother cannot claim she was prejudiced by limited visitation opportunities when she so routinely caused her visitation

to be reduced. And further, Mother does not explain how the reduced visitation has prejudiced her in terms of the termination.

**¶27** Mother further argues that DCS failed to make diligent efforts by neglecting to provide her with a psychological evaluation. Her DCS case manager testified that DCS had been willing to refer her to a psychological evaluation, but it did not do so because she was unwilling to demonstrate thirty days' sobriety as required. Furthermore, Mother had already received a psychological evaluation through COPA Health.

**¶28** Mother similarly argues DCS failed to provide her with family counseling. Her DCS case manager testified, however, that Mother needed to demonstrate she was stable enough to participate in family counseling, which she was never able to do.

**¶29** Mother also argues that DCS improperly directed her to self-refer to domestic violence counseling. Mother suggests that DCS needed to assist her more actively in arranging counseling—for example, by sitting down with her to help her call providers. But as her DCS case manager testified, DCS routinely expects and asks parents to self-refer to services. If Mother had a problem self-referring, she should have advised DCS and sought its help. The superior court also found that DCS coordinated with Mother's existing providers to connect her to individual counseling with a domestic violence component, a finding we accept absent clear error.

**¶30** Finally, Mother argues that DCS should have done more to ensure her contact with service providers—namely, by providing them with the contact information of others, such as her attorney. Mother changed her phone number more than ten times over the course of the dependency, which she argues can be typical for a domestic violence victim. But it was incumbent on Mother to keep her contact information up to date with DCS, as DCS advised her from the start of the dependency.

**¶31** The superior court did not err in finding that DCS made a diligent effort to provide Mother with reunification services.

II.   Best Interests

**¶32** When determining a child's best interests, the superior court must focus on the child's needs and consider the totality of the current circumstances. *See Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 13 (2018). The court may find a child would benefit from termination if the child is adoptable. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 16 (2016). The court may also find that a child will benefit from the permanency and

stability an adoption would provide. *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 337, ¶ 16 (App. 2004); *JS-501904*, 180 Ariz. at 352. Conversely, the court may find termination of the parent-child relationship is in the child's best interests if continuing the relationship would harm the child or the child would benefit from termination. *Demetrius L.*, 239 Ariz. at 4, ¶ 16.

**¶33** Mother argues that if DCS failed to make diligent efforts to provide appropriate reunification services, then the superior court could not have properly found that termination was in the child's best interests. But because reasonable evidence supports the superior court's diligent-efforts finding, we need not address its implications for the best interests analysis. Moreover, Mother's argument misconstrues the superior court's diligent-efforts finding as a necessary element of its best interests determination. *See Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 193–94, ¶¶ 43–44 (App. 1999) (reversing termination based on the State's failure to make efforts to preserve the family, while acknowledging there was "abundant" evidence that termination would serve the child's best interests).

**¶34** Additionally, reasonable evidence supports the superior court's best interests finding. Although the superior court acknowledged Mother and Child shared a strong bond, the court also recognized Child was "very bonded" to her current placement. The court observed that Child waited in foster care for over 29 months, at the end of which Mother was not meaningfully closer to being able to parent safely. The court found that Child was adoptable because she was "developmentally on track, sweet, and loving." The court also found that Child would benefit from termination because it would further the plan of adoption, which would provide Child with permanency and stability. The court also concluded that Child would be harmed by continuing the parent-child relationship because Child would continue to linger in foster care, with the ongoing uncertainty of visitation with Mother.

III.     New Evidence

         A.     First Set of DCS Post-Trial Disclosures

**¶35** In her supplemental brief and reply brief, Mother argues that DCS's initial set of post-trial disclosures violated her due process right to a fair trial. Specifically, Mother contends the additional visitation notes were relevant to whether DCS made diligent efforts to provide appropriate reunification services. Also, because she could not present the additional visitation notes at trial, Mother argues she was denied a fair opportunity to

present evidence that, in her opinion, suggested she had achieved parental fitness or was likely able to do so in the near future. *See* A.R.S. § 8-533(B)(8)(c). But the superior court did not premise its decision to terminate Mother's parental rights on evidence of Mother's supervised visits. Instead, the court's decision turned on Mother's inability to extract herself from the cycle of domestic violence, lack of engagement with reunification services besides supervised visitation, and instability in her mental health, employment, and housing. The superior court did not abuse its discretion in finding that the new evidence was merely cumulative and would not have changed its decision.

### B. Second Set of DCS Post-Trial Disclosures

**¶36** In her second supplemental brief, Mother similarly argues that DCS's second set of post-trial disclosures violated due process. From the second set of disclosures, Mother points to various evidence which, in her view, contradicted the superior court's finding of Child's adoptability. But the superior court's best interests finding may be predicated solely on a finding that continuing the parent-child relationship would harm the child. *Demetrius L.*, 239 Ariz. at 4, ¶ 16. Mother does not address the superior court's finding that Child would be harmed by continuing the parent-child relationship. Accordingly, we have no basis to disturb the court's best interests determination.

### CONCLUSION

**¶37** We affirm.

