NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO A.R. and B.R.

No. 1 CA-JV 24-0175

FILED 05-06-2025

Appeal from the Superior Court in Mohave County
No. S8015SV202400022
The Honorable Aaron Michael Demke, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Harris & Winger, P.C., Flagstaff
By Chad J. Winger
*Counsel for Appellant Father*

Law Offices of Heather C. Wellborn, P.C., Lake Havasu City
By Heather C. Wellborn
*Counsel for Appellee Mother*

**MEMORANDUM DECISION**

Judge Daniel J. Kiley delivered the decision of the Court, in which Presiding
Judge Michael S. Catlett and Judge David D. Weinzweig joined.

**K I L E Y**, Judge:

¶1        Bryan L. ("Father") appeals the juvenile court's order terminating his parental rights to his children, A.R. and B.R. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        Father and Nicolette R. ("Mother") are the parents of B.R., who was born in June 2014, and A.R., who was born in August 2015.

¶3        "Viewed in the requisite light most favorable to sustaining the juvenile court's order," *In re C.R. and A.R.*, 256 Ariz. 170, 172, ¶ 3 (App. 2023) (quotation omitted), the record shows that Father was incarcerated when B.R. was born, and did not see the child until his release two months later. After visiting B.R. once in August 2014, Father never saw him in person again. Father was arrested again in January 2015, and has been in custody ever since. He will remain in custody until 2031. He has never met A.R. in person.

¶4        Although Father has been incarcerated for most of B.R.'s life and all of A.R.'s, the children have had frequent contact with their paternal grandparents throughout their lives. Indeed, as the paternal grandmother later testified, she was "in the hospital room" when each child was born, and "ever since then" has "been in their life [*sic*]."

¶5        After his incarceration in 2015, Mother did not hear from Father again until 2021. Father has never provided her with financial support for the children.

¶6        In 2021, the children's maternal grandparents sought appointment as temporary guardians for the children due to Mother's involvement in a Department of Child Safety investigation relating to another child she has with a different father. Father appeared telephonically at the court hearing to state his objection to the maternal grandparents' request to be appointed temporary guardians, later explaining that he "wanted [the children] to go to [his] family's house" instead. Over Father's objection, the court appointed the maternal grandparents as temporary guardians for the children.

¶7        In January 2024, Mother sent Father an email informing him, as she later testified, "that she hired an attorney" to recover "custody" of the children. "[R]ight after this email," Father filed a petition requesting

2

parenting time. In April 2024, the superior court awarded Mother sole legal decision-making authority for A.R. and B.R. and designated her the children's primary residential parent. The court also granted Father weekly "phone calls . . . visitation . . . [and] video visits" with the children.

¶8  That same month, A.R. and B.R. began participating in counseling "centered around helping them with any issues that they might be experiencing with having visitation with [Father]." The counselor later reported that B.R. said that he "didn't want to have . . . phone call conversations" with Father and that he "wanted the conversations over." The counselor testified to having a similar experience with A.R. Both children expressed that "they didn't really know [Father] and . . . didn't have any . . . existing connection with him." Therapeutic notes reflect that B.R. stated he didn't "want to have a relationship with [F]ather." A.R., too, reported that she didn't "wish to have a connection with [Father]," stating that she "feel[s] [Father] is a stranger."

¶9  In May 2024, Mother filed a petition to terminate Father's parental rights, alleging, as grounds, abandonment, inability to parent because of chronic mental illness or substance abuse, and incarceration of such length as to deprive the children of a normal home. *See* A.R.S. § 8-533(B)(1), (3), (4). The court appointed social worker Tracy Anderson, B.S., to conduct a social study to include "the social history, the present condition of the children and [Mother], proposed plans for the children, and such other facts as may be pertinent."

¶10  Anderson interviewed the children, their maternal and paternal grandparents, and school officials. A.R. and B.R. both said that "they had talked to [Father] on the phone, but they have not seen him in person because he is in prison." B.R. told Anderson that he is "uncomfortable" speaking with Father. When asked if they would want to speak with Father on the phone given the choice, both A.R. and B.R. answered, "No."

¶11  The children's paternal grandfather told Anderson about an occasion when he noticed that B.R. seemed "down and depressed" after a phone call with Father. The paternal grandfather stated that, in his view, the children "should not be made to speak with their dad" and that "forced" visitation "is not in their best interest."

¶12  Anderson concluded her report by noting that "a great deal of research" into the effects on a child of communicating "with an incarcerated parent" indicates that such communication "can be beneficial

when the child and parent share a strong bond" or enjoyed "a consistent and loving relationship" before the parent's incarceration. Conversely, she stated, visitation between an incarcerated parent and a child who did not previously enjoy "a strong connection . . . can negatively impact the emotional well being [*sic*] of [the] child." Anderson stated that in her professional opinion, "that this is one of [the latter] cases." B.R. and A.R. "should not," Anderson opined, "be made/forced to speak to a man that they do not know or have ever [*sic*] had a chance to develop a relationship with outside of a prison facility."

¶13        The court held a termination adjudication hearing in September 2024 at which Mother, Father, various other relatives, Anderson, a teacher at the children's school, and the children's counselor all testified. In her testimony, Mother stated that after Father saw B.R. once as an infant, Mother never heard from Father again regarding the children until his appearance in the 2021 guardianship proceedings. She further testified that the children don't want a relationship with him, explaining that B.R. "gets very shy and shuts down" after speaking with Father and that A.R.'s reaction is "pretty much the same." Being "forc[ed] . . . to talk to" Father, Mother stated, has "been hard for them."

¶14        Although Mother testified that termination of Father's rights would be in the children's best interests, she also stated that she would continue to support the children's relationship with their paternal grandparents. Noting that the children "enjoy" visiting their paternal grandparents, she stated, "I don't see myself taking that away from my kids."

¶15        Anderson testified that she has "done a lot of research" on the impact on children of contact with incarcerated parents and has concluded that whether the impact is "positive" or "negative" depends in large part on the strength of the parent-child relationship before the parent's incarceration. According to Anderson, children who are "forced" to have contact with incarcerated parents with whom they had no prior relationship "can suffer from depression, anti-social behavior, delinquency, anxiety," and other "behavioral issues."

¶16        In his testimony, the children's paternal grandfather acknowledged that Mother has allowed him to have "[p]retty frequent[]" contact with the children throughout their lives. He also described the visit he had with B.R. that Anderson had recounted in her report. According to the paternal grandfather, after "[b]eing forced to talk to his father on the

phone," B.R. "was real shut down," "[h]is head was bowed down," and "he didn't want to talk."

¶17 In his testimony, Father insisted that, despite his incarceration, he has been "keeping up" with his children's activities "through [his] family." Noting that the children frequently visit their paternal grandparents, he stated he asks them for updates on the children and that his mother sends him "pictures" of them "every month." He also testified that in prison he makes "all kinds of cards" as well as gifts in the form of "bears made out of socks," which he sends to his mother or sister for delivery to the children. On cross-examination, he admitted that he did not go to court to seek visitation with the children until January 2024. He also admitted that although he earns money from a job in prison, he has never sent any money to Mother. He claimed, however, that "last week" he sent "a hundred bucks" to his mother for the children's support.

¶18 When asked why his parental rights should not be terminated, Father stated that he feared that his parents would lose their relationship with the children if his "rights [were] taken away." Referring to Mother's testimony that she would continue to support the children's relationship with their paternal grandparents, Father insisted, "You can't trust her on that." Father also expressed concern about what would become of the children if Mother and her parents were, for some reason, unable to continue to care for them. "[I]f . . . something tragically happens on their side," he asked, "where's the kids gonna go?"

¶19 The maternal grandmother testified that Father sends her cards, letters, and bears made out of socks, and that she gives the items to the children when they come to visit her. She further testified that she keeps the items for them at her home. When asked if Father ever sent her money to give to the children, the maternal grandmother admitted that he did not.

¶20 At the conclusion of Mother's case-in-chief, the court granted Father's request to dismiss, for insufficient evidence, the allegation in the petition of grounds for termination under A.R.S. § 8-533(B)(3) (chronic substance abuse).

¶21 At the end of the hearing, the juvenile court granted the petition to terminate Father's parental rights. It found "by clear and convincing evidence" that Father "abandoned the children" by failing "to maintain a normal parental relationship with the children without just cause" under A.R.S. §§ 8-531(1), -533(B)(1). The court also found "by clear and convincing evidence that . . . Father is deprived of civil liberties" and

serving a term of incarceration "of such a length that the children are deprived and will be deprived of a normal home for a period of years" under A.R.S. § 8-533(B)(4). Finally, the court found that termination was in the children's best interests.

**¶22**         Father timely appealed. We have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

### I.     Due Process

**¶23**         Father challenges the order terminating his parental rights to B.R. and A.R., claiming, first, a violation of "his due process right to notice and the opportunity to prepare a defense." According to Father, Mother's petition alleged in a conclusory fashion that termination "is in the children's best interests," without pleading specific facts to support the allegation. "[W]ithout proper notice," he contends, he was "never afforded the opportunity to prepare an adequate defense."

**¶24**         "The Due Process Clause of the Fourteenth Amendment safeguards parents' fundamental liberty interest in their children's care, custody, and management." *Cruz v. Garcia*, 240 Ariz. 233, 236, ¶ 11 (App. 2016) (cleaned up). Due process requires that a party receive "notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Cook v. Losnegard*, 228 Ariz. 202, 206, ¶ 18 (App. 2011) (quotation omitted). We review constitutional claims de novo. *Tracy D. v. Dep't of Child Safety*, 252 Ariz. 425, 433, ¶ 31 (App. 2021) (citation omitted).

**¶25**         A petition for the termination of parental rights must allege grounds sufficient to justify the termination of the parent-child relationship. A.R.S. § 8-533(B); *see also* Ariz. R.P. Juv. Ct. 351(a) (noting that a petition "must allege the grounds for termination"). But there is no requirement that a petition allege specific facts supporting the conclusion that termination would be in the child's best interests. *See* A.R.S. § 8-534 (contents of petition). Moreover, Anderson's social study addressing the detrimental impact that continued contact with Father has on the children was disclosed to the parties weeks before the termination hearing. Father never claimed at the hearing that he was unfairly surprised by any testimony or other evidence, nor did he request a continuance to allow him an opportunity to gather rebuttal evidence. *See Backstrand v. Backstrand*, 250 Ariz. 339, 347, ¶ 32 (App. 2020) (rejecting mother's claim that trial court's time constraints violated her procedural due process rights and noting that mother's counsel "did not . . . request additional time . . . or specify what

other evidence was needed to present [m]other's case adequately"). And when the court announced its decision at the end of the hearing, Father never objected that any of the court's findings were the product of unfair surprise. Even now, Father does not identify any specific piece of evidence or finding by the court that purportedly came as a surprise to him. Father has thus waived this claim on appeal. *See Christy C. v. Dep't of Econ. Sec.*, 214 Ariz. 445, 452, ¶ 21 (App. 2007) (holding that mother waived challenge to sufficiency of findings in support of termination by failing to object in the juvenile court).

## II.     Termination

**¶26**     Father next argues that the juvenile court misapplied Arizona law in terminating his rights.

**¶27**     The right to "the right to the control and custody of one's children," though fundamental, is "not absolute." *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248-49, ¶¶ 11-12 (2000) (quotation omitted). The parental relationship may be terminated if the juvenile court finds, by clear and convincing evidence, at least one statutory ground for termination under A.R.S. § 8-533(B) and further finds, by a preponderance of the evidence, that termination is in the child's best interests. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 13 (2022) (citations omitted). When reviewing an order terminating parental rights, we view evidence in the light most favorable to sustaining the juvenile court's findings. *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008). We will affirm a termination order absent an abuse of discretion. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

### A.     Statutory Grounds for Termination

**¶28**     Father disputes the court's finding that he abandoned the children under A.R.S. § 8-531(1), insisting that "[t]hroughout" their lives he "kept up-to-date regarding [B.R. and A.R.] through regular contact with [their] paternal side of the family."

**¶29**     A parent abandons a child by failing "to provide reasonable support and to maintain regular contact with the child, including providing normal supervision." A.R.S. § 8-531(1). "[A]bandonment is measured not by a parent's subjective intent, but by the parent's conduct," *Michael J.*, 196 Ariz. at 249, ¶ 18, and "depend[s] on the circumstances of the particular case," *Kenneth B. v. Tina B.*, 226 Ariz. 33, 37, ¶ 19 (App. 2010) (citation omitted). "Failure to maintain a normal parental relationship with the child

without just cause for a period of six months constitutes prima facie evidence of abandonment." A.R.S. § 8-531(1).

¶30 When determining whether a parent has abandoned his or her children, a court must consider "whether [the] parent has (1) provided reasonable support to the children, (2) maintained regular contact with them, and (3) provided normal supervision." *Steven M. v. Dep't of Child Safety*, 254 Ariz. 426, 430, ¶ 12 (App. 2023) (citation omitted). Although a parent's incarceration does not, without more, prove abandonment under A.R.S. § 8-533(1), incarceration does not excuse a parent's failure "to make more than minimal efforts to support and communicate with [the] child." *Michael J.*, 196 Ariz. at 250, ¶¶ 21-22. On the contrary, a parent who is incarcerated or otherwise unable to "exercis[e] traditional methods of bonding with [a] child" must "act persistently to establish the relationship" and "must vigorously assert his [or her] legal rights." *Id.* at ¶ 22 (quotation omitted).

¶31 Reasonable evidence supports the termination of Father's parental rights on abandonment grounds. Father met B.R. once, when the child was less than three months old. After Father's incarceration in January 2015, Mother did not hear from him again until he appeared telephonically at the guardianship hearing in 2021. And Father did not seek court-ordered visitation until January 2024. *See Steven M.*, 254 Ariz. at 430, ¶ 13 (finding reasonable evidence to support the termination of parental rights when father "had little or no contact with the children before he was incarcerated," during his incarceration "the contact was non-existent" and, despite not having seen the children for "over three years," father "never petition[ed] the family court for parenting time or legal decision-making authority"). Although Father claims in his briefing that he began communicating directly with the children in 2019 during their monthly visits with the paternal grandmother, the record does not support this assertion. The evidence that Father cites in support of that claim is Anderson's testimony that "prior to 2019 there were no communications between [Father] and the children." Why Anderson mentioned the year 2019 in her testimony about the lack of communication between Father and the children is unclear. Mother testified that Anderson's reference to 2019 was in error and that Anderson was referring to Father's telephonic appearance at the temporary guardianship hearing, which happened in 2021, not 2019. In any event, Anderson did not expressly state that Father began communicating with the children in 2019. More importantly, Father himself did not testify that he began communicating directly with the children in 2019. Instead, he admitted that he "[kept] up" with the children's activities "through [his] family."

**¶32** Even assuming that Father began communicating directly with the children in 2019, the fact remains that he had no prior contact with them since 2015. This years-long absence from the children's lives, by itself, constitutes prima facie evidence of abandonment. *See* A.R.S. § 8-531(1) ("Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment."). It was Father's burden, then, to show that he did not abandon the children. *See Nolte v. Winstanley*, 16 Ariz. 327, 332 (1914) ("A prima facie case . . . can be overthrown only by rebutting evidence adduced on the other side." (quotation omitted)); *see also Dep't of Child Safety v. DeShannon B.*, 1 CA-VJ 19-0262, 2020 WL 2086493 at *3, ¶ 13 (Ariz. App. Apr. 30, 2020) (mem. decision) ("[W]hen a *prima facie* case of abandonment is presented, it . . . creates a presumption in favor of the moving party; the burden then shifts to the parent to rebut the presumption of abandonment."). Father wholly failed to meet this burden. Father's own testimony showed that he relied on his family members for information about his children's lives rather than engaging with the children directly. Although he testified that he sent his mother $100 "last week" to give to the children, the paternal grandmother denied receiving any money from him. And even accepting Father's testimony as true, sending his mother $100 for the children's benefit one week before the termination hearing hardly constitutes the "reasonable support" that might defeat a showing of abandonment. *See In re Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 8 (1990) (holding that prima facie case of abandonment was not "rebutted merely by post-petition attempts to reestablish a parental relationship"). Although the juvenile court accepted Father's "evidence [that he] sent some presents and maybe some cards and other things" to the children "throughout the years," the court also found such evidence insufficient to overcome "the fact that Father did abandon the children for years previously." Reasonable evidence supports the court's determination that Father failed to present evidence sufficient to rebut the presumption of abandonment established by his years-long absence from the children's lives.

**¶33** In *Michael J.*, the Court set forth factors that a court should consider in determining grounds for termination under A.R.S. § 8-533(4), including "the length and strength of any parent-child relationship existing when incarceration begins" and "the degree to which the parent-child relationship can be continued and nurtured during the incarceration." *Michael J.*, 196 Ariz. at 251-52, ¶ 29. Challenging "the sufficiency of the juvenile court's findings" on abandonment, Father faults the court for not applying "the [*Michael J.*] factors." But the *Michael J.* factors apply only when determining when a "sentence is sufficiently long to deprive a child

of a normal home for a period of years." *Id.* The court need not consider those factors when determining whether a parent abandoned the child.

¶34    We affirm, as supported by substantial evidence, the juvenile court's determination that Father abandoned the children under A.R.S. § 8-533(B)(1). And because only one statutory ground is required to support termination of a parent-child relationship, we decline to address Father's challenge to the court's alternative finding of grounds for termination under A.R.S. § 8-533(B)(4). *See Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 577-78, ¶ 5 (App. 2017) (citation omitted).

**B.    Best Interests**

**1.    The juvenile court did not err in failing to accord preclusive effect to the April 2024 order granting Father virtual visits with the children.**

¶35    Noting that the superior court granted him virtual visits with the children in April 2024, Father argues that this prior determination that contact with Father would benefit the children is entitled to preclusive effect. According to Father, the juvenile court's best interests finding "directly contradicts" the April 2024 order "in violation of *res judicata* principles." Mother's petition to terminate, he contends, "amounts to nothing more than a Motion for Reconsideration to be heard by a different judge."

¶36    Courts apply the doctrines of claim and issue preclusion sparingly in proceedings to terminate parental rights. *See Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 349, ¶ 16 (App. 2013). "[C]onsiderations regarding a child's welfare," after all, "are rarely, if ever, static," and "[i]n fact, it is more likely that the child's environment is constantly evolving." *Id.* (cleaned up). For this reason, the principles of judicial economy and finality of judgments on which the doctrines of issue and claim preclusion are based have "limited application" to questions relating to the best interests of children. *Id.*; *see also Lawrence T. v. Dep't of Child Safety*, 246 Ariz. 260, 263, ¶ 9 ("[T]he imposition of artificial constraints that serve merely to advance the cause of judicial economy must not prevent an outcome that is in the child's best interests." (cleaned up)). Following a prior determination of a child's best interests, the "relevant question" when determining "the best interests of the child at the time of the termination hearing" is "whether, generally, there is evidence of changed circumstances." *Lawrence T.*, 246 Ariz. at 264, ¶ 14 (citations omitted).

¶37        In granting Father's request for virtual visitation in April 2024, the superior court had no way of knowing how those visits would impact the children. Subsequent experience showed that the virtual visits negatively affected the children. The juvenile court therefore did not abuse its discretion in determining the children's best interests based on information that was not available to the superior court when it granted Father virtual visitation back in April 2024.

### 2.    Sufficient evidence supports the juvenile court's best interests determination.

¶38        Father contends that the juvenile court's findings are insufficient to support its determination that termination is in the children's best interests. Even if the children do not enjoy their virtual contacts with him, Father asserts, "[t]here is no evidence that [their] time with Father has been harmful to them" since he "has not been abusive or violent." He acknowledges that the children enjoy "stability and permanence" in Mother's home but argues that termination of his rights will not change "any day-to-day aspect of [their] current living arrangement." Termination offers "no legal benefit to" the children, he concludes, and denying termination would do no harm, but would simply "maintain [the] status quo."

¶39        Termination may be in a child's best interests if "the child would benefit from a severance *or* be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). In determining a child's best interests, a court must consider "the totality of the circumstances existing at the time of the severance determination," *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148, ¶ 1 (2018), including whether the child's needs are currently being met, the child's "interest in stability and security," *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3-4, ¶¶ 12, 15 (2016) (quotation omitted), and the parent's "rehabilitation efforts," *Alma S.*, 245 Ariz. at 151, ¶ 15. The court must find by a preponderance of the evidence that termination is in the child's best interests. *See* A.R.S. § 8-533(B); *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 474, ¶ 1 (2023) (citations omitted).

¶40        Evidence in the record establishes that the children reacted negatively to virtual visits with Father. Anderson testified that "forc[ing]" children to have contact with incarcerated parents with whom they had no prior relationship can lead to "depression, anti-social behavior, . . . anxiety," and other "behavioral issues." This evidence supports the court's finding that the children would derive a benefit from the termination of Father's

11

parental rights. *See Steven M. v. Dep't of Child Safety*, 254 Ariz. 426, 431, ¶ 16 (App. 2023) (affirming best interests determination based on evidence that placement was meeting the children's needs, that "the children did not think of Father as their father," and that "forcing contact . . . could traumatize the children").

**¶41** Father presented no countervailing evidence of any benefit to the children from maintaining the parent-child relationship. When asked, at the hearing, why termination would not be in the children's best interests, Father did not claim that he shares a close bond with the children, or even that he hopes to develop one. Instead, he stated that he fears that termination of his rights would jeopardize his parents' relationship with the children. Though he did not dispute that Mother has supported the children's relationship with the paternal grandparents, he speculated that she would discontinue that support in the future. He also expressed concern about the children's placement if Mother and her parents became unable to care for them. A best interests determination cannot be based on speculation about future events. *Cf. Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 7 (1990) (finding mother's testimony that possible "future husband" might "wish[] to adopt" the child to be too speculative to support a best interests finding). Further, if Father's fears come to pass and Mother decides to keep the children away from their paternal relatives, Father's parents could seek judicial relief to maintain their relationship with the children. *See*, *e.g.*, A.R.S. § 25-409(C)(3).

**¶42** At the conclusion of his testimony at the termination hearing, Father stated, "My whole family loves those kids. We want to be a part of those kids' lives." While Father's testimony that he loves the children may support a finding that maintaining the parent-child relationship is in *Father's* best interests, it does not support a finding that maintaining the relationship is in *the children's* best interests. A finding that a parent abandoned the child establishes that the parent is unfit. *Alma S.*, 245 Ariz. at 150, ¶ 10. When the court determined, by clear and convincing evidence, that Father was an unfit parent because he abandoned B.R. and A.R., the court was required to "presume" that Father's interests and those of the children "diverge," *see Kent K. v. Bobby M.*, 210 Ariz. 279, 286, ¶ 35 (2005), and could not properly "subordinate the interests of [the children] to those of the parent," *see Alma S.*, 245 Ariz. at 151, ¶ 15. In light of the evidence that contact with Father negatively affects the children, and in the absence of any evidence of any benefit the children would derive from maintaining the parent-child relationship, the court did not err in finding by a preponderance of the evidence that termination was in their best interests.

### III.   Ineffective Assistance of Counsel

**¶43**      Father also argues he received ineffective assistance of counsel ("IAC"), asserting that "the result of the proceedings would have been different" had his counsel presented evidence "that he maintained a relationship with the [c]hildren throughout their lives."

**¶44**      An order terminating parental rights may be set aside if the counsel's representation of the parent "was such that it undermined the fundamental fairness of the proceeding and cast doubt on the proceeding's protection of the individual against arbitrary action of government." *Royce C. v. Dep't of Child Safety*, 252 Ariz. 129, 136, ¶ 20 (App. 2021) (cleaned up). Relief on these grounds is "an extraordinary remedy, unavailable in all but the most egregious cases." *Id.* at 138, ¶ 26. To grant relief on this basis, the court must find that counsel's conduct was so deficient "that it denie[d] the parent fundamental fairness or shock[ed] the conscience," and that the outcome may have been different but for counsel's deficient performance. *Id.* at 138, ¶ 25. A parent alleging ineffective assistance of counsel bears the burden of establishing his or her claim. *John M. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 320, 325, ¶¶ 18-19 (App. 2007).

**¶45**      In support of his IAC claim, Father complains, first, that his counsel "allow[ed] Mother to consume nearly all the trial time on her case in chief." The record does not support this assertion. Although Mother called more witnesses at the termination hearing than Father did, Father's counsel conducted a thorough, and thus time-consuming, cross-examination of most of Mother's witnesses. *Cf. Backstrand*, 250 Ariz. at 347, ¶ 30 (rejecting mother's claim that trial court violated her right to procedural due process by allowing father more time to present his case than she was allowed; "Mother's characterization of an 'imbalance' in the time allotted to each party ignores the fact that [m]other's trial counsel cross-examined nearly all of [f]ather's witnesses extensively.").

**¶46**      Father next asserts that his counsel was deficient in failing to offer certain items of physical property as exhibits. When Father's counsel asked the paternal grandmother at the hearing about gifts that Father had sent from prison for the children, she responded, "I have them in my bag here." Counsel said, "You can't show them," but asked her to "describe them." The paternal grandmother then proceeded to testify that Father sent the children holiday cards and bears made from socks, adding that Father has "absolutely" been consistent in sending gifts and cards to her to deliver to the children. She also testified that she photographed and recorded the children as they received Father's cards and gifts. Father now argues that

counsel was deficient in failing to "move into evidence any of the videos, cards, gifts or letters that the paternal grandmother brought to court on the day of the trial."

**¶47** Applicable court rules do not permit a party to present exhibits that a witness brings "to court on the day of trial." On the contrary, the rules require parties to identify and disclose exhibits no less than thirty days before an adjudication hearing. Ariz. R.P. Juv. Ct. 315(d). Father does not allege that any of the items the paternal grandmother brought with her to the hearing had been provided to his counsel in advance so they could be timely disclosed. Counsel cannot fairly be faulted for not offering exhibits at the hearing that had never been disclosed as required by court rules. Deficient performance cannot be established, after all, by counsel's compliance with disclosure rules. *Cf. State v. Vasquez*, 142 Ariz. 527, 529-30 (App. 1984) (finding that counsel's failure to file amended petition for post-conviction relief did not establish IAC because counsel "complied with" applicable rules in determining that amended petition was not necessary). In any event, Father's counsel elicited testimony from Father and the paternal grandmother about those cards and gifts, and the court referenced that testimony in its ruling. Because Father's counsel presented testimony about the cards and gifts that Father sent from prison for the children, Father has established no prejudice from his counsel's failure to offer those items as exhibits upon learning that the paternal grandmother brought them with her when she came to court to testify. *See John M. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 320, 325, ¶¶ 18-19 (App. 2007) (rejecting parent's IAC claim due to parent's failure to establish prejudice).

**¶48** Finally, Father complains that his counsel "never presented . . . evidence" that he "spoke to the [c]hildren frequently" during their visits to the paternal grandmother's home. But Father's counsel gave him ample opportunity to testify about his efforts to communicate with the children. When counsel asked him, "[W]hat is your means of communicating with the outside world," Father replied, "I can call anybody. The prison provides a Tablet and basically you can call anybody at any time." When counsel followed up by asking, "And have you used this Tablet to try to reach out to your kids?", Father answered, non-responsively, that he has "pictures" and "videos" of the children. He then stated that he uses the Tablet to call his parents and his sister to ask "how the kids are doing," adding, "I go [*sic*] everything through my family." If Father had ever used the Tablet to call the children directly, he could and should have said so when his lawyer asked him that question. He didn't, and that's not his lawyer's fault. Because Father has shown neither deficient performance nor prejudice, he is entitled to no relief on his IAC claim.

**CONCLUSION**

¶49   For the foregoing reasons, we affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:  JR